In the

# United States Court of Appeals

## For the Seventh Circuit

No. 00-3341

LEONARD J. TREJO,

*Plaintiff-Appellant*,

*v.*

EDWARD J. SHOBEN, JESSIE G. DELIA,
LARRY R. FAULKNER, LOUIS F. FITZGERALD, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 98-2085—**David G. Bernthal**, *Magistrate Judge*.

ARGUED FEBRUARY 26, 2002—DECIDED JANUARY 30, 2003

Before FAIRCHILD, COFFEY and KANNE, *Circuit Judges*.

COFFEY, *Circuit Judge*.  Leonard J. Trejo was a non-tenured assistant professor of psychology at the University of Illinois Urbana-Champaign campus who received three one-year appointments to his position in each of the school years between 1994-95 and 1996-97 before he got into trouble necessitating his discharge. After the University terminated him in August 1997, Trejo filed suit under 42 U.S.C. § 1983, alleging that the University violated his constitutional rights to freedom of speech and due process under the Constitution of the United States and the State of Illinois. The district court dismissed Trejo's free

speech claims and granted the University's motion for summary judgment with respect to Trejo's due process claims. We affirm.

## I.  FACTUAL BACKGROUND

In August 1994, as part of an affirmative action plan, Leonard J. Trejo was appointed to teach as a probationary, non-tenured assistant professor in the department of psychology at the University of Illinois. Trejo's appointment was subject to renewal at the end of each school year, and he was eligible to be considered for tenure only if he met the University's expectations for teaching courses, researching and publishing articles, and serving as a mentor to students over the course of several years. The University came to the conclusion after an investigation that Trejo had failed to meet these expectations. In October 1995, the chairman of the psychology department, Edward J. Shoben, received several complaints from students about Trejo's misconduct and, after an investigation, expressed concerns about Trejo's "trustworthiness, lack of judgment, and serious problems relating to students, especially women." Thereafter, Shoben drafted a report of his conclusions and findings and contacted the University's administrators and recommended Trejo's termination. The administrators then proceeded to conduct their own independent investigation and, after review, refused to renew Trejo's contract.

The complaints that Shoben received concerning Trejo were made by several female graduate students who approached Shoben upon their return from an academic conference in Toronto, Canada, they attended with Trejo in October 1995. Trejo and the Illinois students were lodged in the same hotel that was also the site of the academic conference, and following the first day of presentations, they met with several of the conference

attendees for late night drinks and a meal at the hotel's restaurant and bar. Over the next 45 minutes, Trejo attempted to regale his dinner companions with a discussion of a documentary recently aired on a local television station concerning the sexual behavior of primates.

Trejo vociferously opined that there is a relationship between pregnancy, orgasms, and extramarital affairs and went on to advocate sex outside marriage and extramarital affairs. Trejo claims that his intent was to foster an academic debate over sociobiological theories of mating by asking whether "we can take an animal model of sexual behavior and extrapolate it to humans." He characterized his comments as being intellectual and clinical in nature, saying that he focused exclusively on matters of reproductive biology and scrupulously avoided the use of questionable or offensive language. It is interesting to note that in his deposition before trial, Trejo refused to concede that his statements—which incorporated the use of hand gestures to demonstrate various parts of the female anatomy, including the cervix—were objectionable in any respect.

Every other man and woman seated at the table that evening at the conference was offended by Trejo's speech, concluding that he was "out of control" and that his remarks were little more than thinly veiled sexual solicitations directed at the female graduate students in the group. One graduate student, Leun Otten, stated that Trejo was using the conversation as a way to broach "matters related to sex." Graduate student Jennifer Isom and Wichita State University Professor Darryl Humphrey concurred with Otten's sentiments, stating that Trejo (who was married at the time) was trying to persuade the women at the table to embrace the notion that it is acceptable to have an extramarital affair. When referring to Trejo, a third graduate student, Timothy Weber, stated that the entire conversation "had sexual undertones" and

a propositioning aspect, adding that Trejo "seemed to be testing the waters, possibly trolling for females or finding companionship for the evening." Graduate student Blair Hicks further was of the opinion that Trejo seemed to be taking some sort of sadistic pleasure in making the female students feel uncomfortable. Indeed, once Trejo left the table, an embarrassed Professor Humphrey subsequently felt it necessary to apologize to the students for Trejo's behavior.

Trejo seemed indifferent to the concerns of his dinner companions, for he continued his pattern of sprinkling off-color comments into conversations during the next several days of the conference. For example, later that same evening Trejo invited graduate students Jennifer Keller and Brandy Isaacks to play cards in his hotel suite, and after they grew tired Trejo commented that the female students should undress, declaring, "Well, it's either we're going to quit playing cards or we're all going to get naked and go to bed!" The next night, as Trejo and Humphrey were preparing to attend a party in the hotel's grand ballroom, Trejo proceeded to make vulgar and disgusting comments and jokes about women, using coarse and derogatory language that we refuse to repeat in this opinion.[1] He also suggested to Humphrey that they should "go to the president's party and see if we can find some women to bring back!" Later on, while in attendance at the party, Trejo struck up a conversation with a Stanford University professor who knew Isaacks and commented that he "wanted to get [his] hands on her."

In addition to making sexually charged comments in the presence of male and female professors and students, Trejo

---

[1] If one is inclined to read a more graphic recitation of Trejo's vulgar language and derogatory remarks and jokes about women, he or she might examine paragraph 99 of Trejo's Response To Defendants' Statement Of Undisputed Facts. (Doc. No. 41 ¶ 99.)

also saw fit to engage in childish behavior while attending a party in Humphrey's hotel suite. After lamenting the fact that he was having marital problems, Trejo decided that he wanted to entertain his guests and drink a can of beer while standing upside-down on his head. Trejo repeatedly pleaded with Keller to pour the beer in his mouth but she refused. Trejo eventually found another person to serve him alcoholic beverages in this peculiar manner as he proceeded to become intoxicated. Meanwhile, the party continued into the wee hours of the morning until about 2 a.m., and at this time, Trejo telephoned Isaacks and awoke her, impersonated a male graduate student, and invited her to his room to play cards. Not surprisingly, Isaacks declined the invitation and remained in her room.

In the days following the Illinois delegation's return to the campus, Trejo persisted with his unwelcome invitations to engage Keller and Isaacks in extracurricular social activities. Trejo sent the two women an e-mail inviting them to play euchre at a local tavern. In the e-mail, titled "Obligatory Challenge," Trejo alluded to his impending divorce by referring to his wife as "my soon-to-be-ex (STBX)" and writing, "Well, my STBX has always said I'm a male chauvinist. Perhaps that's why I'd like to challenge J & B to a rematch at euchre. How about it guys?" The students responded that they were not interested and thereafter consulted their faculty mentor, Gregory Miller, and told him about Trejo's lascivious behavior in Toronto. The students ultimately decided to meet with Shoben and expressed their concerns about Trejo's continuous pattern of unwelcome, inappropriate, boorish behavior and requested Shoben's assistance in resolving these problems. The students went on to explain they felt uncomfortable and awkward around Trejo and were avoiding contact with him by steering clear of his office and were refusing to enroll in his classes. They added that they were reluctant to

approach Trejo directly and file a formal grievance in view of the fact that he served on a committee that distributed research grants and they were in fear of possible retaliation.

Shoben proceeded to investigate the complaints, and after speaking with more than a dozen individuals, he concluded that Trejo had behaved boorishly around numerous female graduate students ever since his arrival in Urbana in August 1994. Shoben learned, among other things, that Trejo solicited at least three students for dates, even going so far as to invite one woman to "dress up in something skimpy" and take a motorcycle ride with him on the beach. Shoben also became aware during his investigation that Trejo had similar difficulties with this type of conduct at his prior place of employment at the Navy Personnel Research and Development Center in southern California.

Shoben spoke with Trejo on three separate occasions between December 1995 and March 1996 in an attempt to inform Trejo of the allegations and invite a response. Trejo took umbrage and denied the charges, but as Shoben proceeded with the investigation, one of his main concerns was that Trejo appeared to be less than truthful. For example, Trejo initially refused to admit contacting Isaacks in the middle of the night and criticized Shoben for believing that he was "the kind of person who would do something like call a female graduate student at 2 a.m. pretending to be someone else." However, Trejo later acknowledged calling Isaacks—but stated that it was only a joke. Shoben also learned that Trejo contacted Professor Humphrey, reminded him that they were "buddies," and attempted to persuade him to recant certain statements he made to Shoben about the Toronto incident. Based on this information, as well as the fact that Trejo, in response to a question, told Shoben that he was unaware

of any reason why the female graduate students would file false charges against him at the time, Shoben came to the conclusion that Trejo had engaged in a series of unprofessional actions, alienated several graduate students and faculty members within the department, and, furthermore, refused to accept responsibility for his misconduct. Thereafter, Shoben prepared a written summary of the results of his investigation and gave a copy to Trejo and the dean of the college, Jessie G. Delia, and recommended that Trejo be terminated. "[T]he reasons for this recommendation," Shoben stated in a letter to Trejo, "have to do with your trustworthiness, your professional judgment, and your relations with graduate students. In my judgment, your performance on all three of these dimensions has been unsatisfactory."

Delia met personally with Trejo and discussed his pattern of misconduct, including his behavior at the hotel/bar and his midnight phone call to Isaacks while they were attending the conference in Toronto. Even though he was not obligated to, Delia granted Trejo an opportunity to prepare a written response to Shoben's recommendation, as Trejo was on a probationary, non-tenured status. Trejo obtained legal counsel and submitted an 8-page typewritten response along with numerous materials and several letters from individuals of the belief that he should be allowed to retain his position with the University. In May 1996, Dean Delia and a faculty advisory committee reviewed these materials, conducted an independent review of Shoben's findings, and thereafter voted against renewing Trejo's probationary appointment. Trejo filed a notice of intent to appeal the committee's decision and received several extensions in order that he might submit additional material for consideration by the University. Despite receiving the extra time he requested, Trejo failed to submit any additional materials, and the faculty committee met a second time in August 1996 and again

recommended termination. Thus, pursuant to University policy requiring that non-tenured assistant professors must receive at least one year's notice of non-reappointment, Trejo was advised of the University's decision in mid-August 1996 and was terminated August 20, 1997.

## II.  DISCUSSION

### A.  *Free Speech Claims*

Initially we address Trejo's claim that the University violated his rights to freedom of speech when it refused to renew his annual teaching appointment. Trejo argues that his "discussion at the conference in Toronto amongst faculty, post-doctorate and graduate students relating to human sexuality is protected under the First Amendment to the Constitution of the United States,"[2] and that it was unconstitutional for the University to terminate him on the basis of the statements he made.[3] We reject Trejo's argument, for we are convinced that while Trejo's complaint alleges that he engaged in expressive activity pro-

---

[2]  Trejo also argues that the University violated his right to free speech under Article I § 2 of the Illinois Constitution of 1970. Our analysis of Trejo's state and federal free speech claims is identical, for the Constitution of the State of Illinois protects an individual's right to free speech only to the same extent that such speech is protected by the Constitution of the United States. *Rubin v. Ikenberry*, 933 F. Supp. 1425, 1439 (C.D. Ill. 1996).

[3]  Trejo's complaint alleged that the University violated two separate rights: his right to freedom of speech and his right to academic freedom. The academic freedom claim is subsumed by the broader free speech claim, for "the First Amendment guarantees are sufficiently broad to provide some protection for what has been called 'academic freedom.'" *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1304 (7th Cir. 1980). *Cf.* R. DWORKIN, FREEDOM'S LAW 247-50 (1996).

tected by the First Amendment, the facts in this record conclusively establish that his speech was related to matters of private concern and thus cannot form the basis of a constitutional challenge. *See Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563 (1968).

The First Amendment protects an individual's right to freedom of expression. Furthermore, because of our mistrust of "laws that cast a pall of orthodoxy" over educational institutions, *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967), the First Amendment protects the right of faculty members to engage in academic debates, pursuits, and inquiries and to discuss "ideas, narratives, concepts, imagery, [and] opinions—scientific, political or aesthetic—[with] an audience whom the speaker seeks to inform, edify, or entertain." *Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir. 1990). However, a public employee's freedom of speech on matters of public concern is far from absolute and all-encompassing, and the exercise of protected speech may nevertheless serve as the basis for termination if the employer articulates convincing reasons for taking such action. *See Waters v. Churchill*, 511 U.S. 661 (1994); *Connick*, *supra*; *Pickering*, *supra*.

In cases like the one before us, where the employer brings a motion to dismiss the employee's free speech claim *on the basis of the pleadings rather than on the facts in the record*, the speech may be presumed to involve a matter of "public concern" if it touches upon "any matter for which there is potentially a public" interest. *Eberhart v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994). "The purpose of the 'public concern' requirement is to distinguish [between] grievances of an entirely personal character from statements of broader interest concerning one's job, rather than to fix the boundaries of the First Amendment." *Id.* Indeed, we have previously explained that

when the Supreme Court in its cases establishing and bounding the rights of public employees to exercise free speech limited those rights to speech on matters of "public concern," they did not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; they meant matters in which the public might be interested, as distinct from wholly personal grievances . . . and casual chit-chat.

*Dishnow v. School Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996).

We have cautioned that "it would be a rare case indeed where the pleadings as a whole would permit judgment as a matter of law" in favor of the employer. *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997). Thus, we held in *Eberhart* that an assistant state's attorney in Illinois properly alleged that he was speaking on a matter of "public concern" when his complaint pled that he was writing a fictional novel concerning the criminal justice system. We stated that a public employee's decision to write a book of fiction dealing with the criminal justice system is presumptively protected by the First Amendment and that the trial judge erred when dismissing the complaint before the defendant filed an answer setting forth what legitimate reasons, if any, it may have had for terminating the plaintiff. 17 F.3d at 1027-28.

When we apply *Eberhart*'s reasoning to the facts pled in Trejo's complaint, we may assume that Trejo spoke on matters that warrant some level of constitutional protection and that the University could not have fired Trejo for his comments unless it offered a reason for doing so. *See id.*; *Gustafson*, 117 F.3d at 1018-19. *Cf. Krizek v. Board of Educ.*, 713 F. Supp. 1131, 1139 (N.D. Ill. 1989). Based on Trejo's pleadings in this case—which we accept as true when deciding a motion to dismiss rather than a

motion for summary judgment—we are told that Trejo was a non-tenured assistant professor of psychology who was in attendance at an off-campus professional conference along with other graduate students and professors in his area of academic expertise; that he met these individuals at a restaurant/bar for a late night dinner and some conversation; that they engaged in a spirited "academic and intellectual debate" precipitated by a public television broadcast dealing with research about the mating rituals of humans and primates; that none of the students considered it necessary to object or express discomfort with his remarks that evening; and that he was thereafter unlawfully terminated in retaliation for his speech. (Compl. ¶¶ 12-22, 44-48.) Thus, a reading of the Complaint in the light most favorable to Trejo reveals his claim that his civil rights were infringed upon when he was discharged by administrators who allegedly capitulated to the pressure placed on them by certain feminist graduate students who felt that his speech was too provocative, insensitive, and/or "politically incorrect" to remain on the faculty at the University of Illinois.

Nevertheless, we affirm the trial court's decision to dismiss Trejo's free speech claims (Counts II and IX) and make clear that the University would have been entitled to summary judgment prior to trial. We have the discretion to affirm the district court's decision to dismiss part of a multi-count complaint if: (1) subsequent discovery in connection with a separate claim clearly reveals that the defendant-appellee would have been entitled to summary judgment on the claim that was dismissed; and (2) the plaintiff-appellant fails to identify what additional favorable facts might possibly have been revealed through additional discovery if the claim had not been dismissed. *See American Nurses Ass'n v. State*, 783 F.2d 716, 729 (7th Cir. 1986); *see also Kitzman-Kelley v. Warner,* 203 F.3d 454, 461-62 (7th Cir. 2000) (Posner, J., dissenting).

The gravamen of Trejo's free speech claim is identical to those portions of his substantive due process claim in which he argues that the University violated his civil rights when terminating him on the basis of his comments at the restaurant/bar in Toronto as well as his vulgar behavior on numerous occasions both before, during, and after the conference, which came to light after Shoben's investigation was undertaken and completed. (Pl. Br. at 19.) After Trejo availed himself of his right to ample discovery in connection with the due process claim, the district judge granted the University's motion for summary judgment, finding that Trejo failed to produce even a scintilla of evidence to support his theory that he was terminated due to his speech rather than his pattern of misconduct. Furthermore, Trejo neither in his appellate brief nor at oral argument maintained that he could have uncovered additional materials to overcome the facts set forth by the University in support of its position that he "was nonreappointed because he lied about his activities, because of the totality of his behavior toward the female graduate students, and because of concerns about his trustworthiness, professionalism, and judgment." (Def. Br. at 21.) Thus, we may properly consider whether the University is entitled to summary judgment on Trejo's First Amendment retaliation claim based upon the record before us. *See American Nurses*, 783 F.2d at 729.

The undisputed facts in this record demonstrate that Trejo's comments were focused almost exclusively on matters of private concern, thus belying the allegations in his complaint and thus requiring that we grant summary judgment in favor of the University. The chair of the University's psychology department, Edward J. Shoben, explained that after the completion of his review and investigation he was convinced that the totality of Trejo's statements and actions mandated termination,

including: (1) Trejo's remarks to a Stanford University professor that he "wanted to get his hands" on Illinois graduate student Brandy Isaacks; (2) Trejo's decision to telephone Isaacks in the middle of the night, conceal his identity, impersonate another graduate student, and ask her to play cards with him; (3) Trejo's initial refusal to admit that he telephoned Isaacks despite the fact that witnesses were present when he placed the phone call; (4) Trejo's statement to a Wichita State University professor that they should "go to the president's party and see if we can find some women to bring back" to their hotel room; (5) Trejo's attempt to persuade graduate students to pour a beer in his mouth while he stood upside down on his head; (6) Trejo's sexual comment and declaration during a late night card game with two female students that "we're going to quit playing cards or we're all going to get naked and go to bed!"; (7) Trejo's attempts to solicit dates from graduate students, including his decision to send the students an e-mail that referred to his impending divorce and challenged the students to an "obligatory rematch" of the previously discussed card game; (8) Trejo's attempt to persuade the Wichita State professor to recant certain statements he made to Shoben about Trejo's conduct; and (9) Trejo's statements that there is a relationship between pregnancy, adultery, and sexual pleasure.

"Casual chit-chat between two persons or otherwise confined to a small group . . . is not protected" under the First Amendment. *Swank*, 898 F.2d at 1251. Thus, the off-color comments Trejo made while he was attending parties, playing cards, or frequenting taverns around the University—such as his comment that he wanted to "get his hands" on one graduate student and "get naked" or "drink some good beer" with another—is casual, idle, and flirtatious chit-chat that may not form the basis of a First Amendment claim. *See id.; Contreras v. City of Chi-*

*cago*, 920 F. Supp. 1370, 1388 (N.D. Ill. 1996). Furthermore, after review of all the facts and circumstances dealing with Trejo's conduct during his three years as a non-tenured probationary employee at the University of Illinois, we hold that Trejo's statements in Toronto regarding the sexual behavior of non-human primates likewise failed to address an issue of public concern under *Connick* and *Pickering*. The statements were simply parts of a calculated type of speech designed to further Trejo's private interests in attempting to solicit female companionship and, at the same time, possibly to irritate the other graduate students to whom he was speaking. The record before us makes clear that Trejo was prattling on before a table of acquaintances who had been drinking alcoholic beverages in a noisy restaurant/bar rather than lecturing to students in a classroom setting on a topic relevant to their field of study. The individuals seated at the table all agreed that Trejo's off-color remarks were delivered in a flirtatious manner peppered with double entendres and ribald references, while the record is barren of any evidence besides Trejo's self-serving statements that the remarks were designed to serve any truly pedagogic purpose. Rather, Trejo left the lounge to play euchre with a group of students immediately after his speech, thus further establishing that his chit-chat throughout the evening primarily served to whittle away the time and further his own peculiar interests rather than any matter of public concern. Accordingly, the scales are tipped in favor of the University, and we are convinced that it is entitled to summary judgment on Trejo's speech-based claims. *See Wales v. Board of Educ.*, 120 F.3d 82 (7th Cir. 1997); *Smith v. Fruin*, 28 F.3d 646 (7th Cir. 1994); *Keen v. Penson*, 970 F.2d 252 (7th Cir. 1992); *Swank*, 898 F.2d at 1251; *Rubin*, 933 F. Supp. at 1443-44.

## B.  *Federal Due Process Claims*

We are also convinced that the trial judge properly granted summary judgment in favor of the University on the claims brought by Trejo under the Due Process Clause of the Fourteenth Amendment. As we noted *ante* at 1, Trejo alleges that the University violated his substantive due process rights when terminating him, in part, because of his expressive activity in Toronto. Although we explained in Part II.A that none of Trejo's statements were protected as speech about matters of public concern, Trejo nonetheless argues that the University's decision violated his substantive due process rights by imposing an "utterly unreasonable" or "arbitrary" restriction upon his right to speak on matters of private concern.

"A restriction on a form of liberty not explicitly codified in the Bill of Rights or singled out by the courts for special protection under such rubrics as 'right to privacy' and 'fundamental rights' violates the due process clause only if [it is] utterly unreasonable—that is what 'arbitrary' means in this setting—and it is less likely to be found so if it is a regulation of public employees than if it is a regulation of private citizens." *Swank*, 898 F.2d at 1252. We hold that it was proper for the University to terminate Trejo because of his conduct and comments during the academic conference in Toronto during October 1995, including but not limited to the off-color remarks to the graduate students at the restaurant/bar in Toronto, as well as his conduct before and after the conference which did not come to light until such time as the investigation was completed.

Trejo's conduct and statements in Toronto, when viewed in conjunction with the pattern of unprofessional conduct, poor judgment, and lack of trustworthiness demonstrated throughout his term of employment, had the effect of alienating professors and graduate students on the

Illinois campus and at other institutions across the nation. Professors at Stanford and Wichita State universities advised Shoben that the University's ability to attract talented female graduate students might suffer if Trejo's behavior became widely known among prospective applicants. Furthermore, several of the female graduate students within the department stated that they feared Trejo might retaliate against them for spurning his romantic advances, that they felt uncomfortable around him, and that they began avoiding him by refusing to walk past his laboratory as well as declining to enroll in his courses. It goes without saying that a university has an interest in fostering a collegial educational environment while doing everything within its power to maintain its reputation in the academic community both on campus and around the nation. Thus, we are convinced that it was eminently reasonable for the University to take action against Trejo under these circumstances. *See Korf v. Ball St. Univ.*, 726 F.2d 1222 (7th Cir. 1984). "Common sense, reason and good judgment should have made him cognizant of the fact that his conduct could and would be cause for termination." *Id.* at 1227.

In reaching this conclusion, we reject Trejo's claim that the University violated his civil rights when it partially relied upon Shoben's recommendation as a basis for termination. Although Shoben held face-to-face meetings with Trejo on three separate occasions in an attempt to discuss the graduate students' allegations, Trejo spends a significant portion of his brief arguing that Shoben conducted a one-sided investigation because he harbored personal grudges against Trejo and was committed to "leading the lynch mob" against him. (Pl. Br. at 19-23.) We disagree with Trejo's contention and find this argument to be without merit, for even if we assume that Shoben was brimming over with animosity, we must not lose sight of the fact that Shoben's reasoning and recommen-

dation to terminate probationary employee Trejo was reviewed by two separate, independent faculty committees which conducted their own investigations of the charges and likewise came to the conclusion that Trejo's misconduct warranted his removal from the faculty. The two administrators who were responsible for hiring Trejo as part of the University's affirmative action plan (Dean of the College Jesse G. Delia and Provost Larry R. Faulkner) also exchanged e-mails and met personally with Trejo on a number of occasions while discussing his concerns about Shoben's alleged biases but ultimately agreed that Trejo should be terminated because of the contents of the record before them concerning Plaintiff-Appellant Trejo's gross misconduct exhibited during his three years as a non-tenured professor. The University's investigation and hearings went well beyond what was required by the Constitution, and we reject Trejo's argument that his substantive due process rights were violated. *See Eiland v. Trinity Hosp.*, 150 F.3d 747, 752 (7th Cir. 1998); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547-48 (7th Cir. 1997); *see also Hamilton v. MCBOE*, 122 F. Supp. 2d 1273, 1283-88 (M.D. Ala. 2000) (discussing elements of vicarious "cat's paw" liability).

We also disagree with Trejo's contention that he was deprived of his rights to procedural due process. Trejo was a non-tenured probationary employee who was appointed to one-year contracts subject to annual review and renewal by the University. Trejo argues that the refusal to renew his appointment deprived him of property and liberty interests in pursuing work as a public educator. However, the law is eminently clear that non-tenured professors within the University of Illinois system are probationary employees who lack any constitutionally protected property interest that would afford them rights to due process. *See Weinstein v. University of Illinois*, 811 F.2d 1091 (7th Cir. 1987); *McElearney v.*

*University of Illinois*, 612 F.2d 285 (7th Cir. 1979). Furthermore, an employee's right to pursue his or her chosen occupation is infringed only if "the 'circumstances of the discharge, at least if they were publicly stated, had the effect of blacklisting the employee from employment in comparable jobs.'" *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (quoting *Colazzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987)). The record is barren of evidence indicating that the University publicized the basis for terminating Trejo, much less blacklisted him. Indeed, after Trejo left his non-tenured position at Illinois, he returned to his native state of California and shortly thereafter accepted a supervisory position paying $81,000 a year with a research laboratory managed by a federal agency. This is an increase of $32,000 over his salary as an assistant professor. On the basis of the record before us, we conclude that Trejo's procedural process claims are frivolous and that any harm that may come to him in the future as a result of his professional misconduct at the University of Illinois is solely of his own making.

### C. *State Due Process Claims*

Although we determined in Part II.B that Trejo's claims fail under federal law, Trejo also argues that he was deprived of his rights to due process under the Illinois Constitution of 1970. The Illinois Supreme Court has stated that it "labor[s] under no self-imposed constraint to follow federal precedent in 'lockstep' in defining Illinois' due process protection." *People v. Washington*, 665 N.E.2d 1330, 1335 (Ill. 1996). However, the Court has stressed that it has interpreted its constitution to provide citizens with greater protections than the federal constitution only in those instances where it has "found an appropriate basis to do so," adding that "federal precedent interpreting the federal due process clause is useful as

a guide in interpreting the Illinois provision." *Lewis E. v. Spagnola*, 710 N.E.2d 798, 812 (Ill. 1999).

Trejo has failed to cite, much less discuss, any case law holding that an Illinois court has expanded and endowed non-tenured university professors with due process rights beyond those set forth by the Fourteenth Amendment. In support of his claim of an entitlement to protection under the Illinois Constitution, Trejo has referred us only to the following excerpt from the debates of two delegates to the Sixth Illinois Constitutional Convention of 1970:

> MRS. LEAHY: I have several questions, Mr. Lennon. It seemed to me that there has been a great deal of development of the due process interpretation in the Federal Constitution in the last 15 years, and the cases that you referred to, to define 'due process,' were quite old. Did your committee mean to incorporate the recent interpretations of the Due Process Clause of the Federal Constitution into this clause?

> MR. A. LENNON: Well, I don't think anybody is trying to incorporate by reference anything. We are faced with whatever the law is, and it may be different by this afternoon at 3 o'clock than it was yesterday, depending upon what the Supreme Court is doing. I think we all recognize that no matter what concept or doctrine you talk about, we have to live with what the Supreme Court interprets in particular cases.

3 RECORD OF PROCEEDINGS: 6TH ILLINOIS CONSTITUTIONAL CONVENTION 1501 (June 4, 1970). These above-quoted statements were made during a discussion about the general nature of due process. The discussion focused on the rights of unborn children, but contained absolutely no reference to the rights of non-tenured professors within the University of Illinois system, and thus has no relevance to the issue before us. Based on our review of the evidence in this record, we refuse to hold that the Illinois Constitution's Due Process Clause entitles such probationary employees to additional rights beyond those provided under federal law.

## III.  CONCLUSION

The record makes abundantly clear that the University of Illinois terminated Professor Leonard J. Trejo because his lack of professionalism, poor judgment, and insufferable behavior around his colleagues and fellow graduate students disrupted the educational process and tarnished the University's good name. Several administrators met personally with Trejo before his discharge, thereby allowing him greater procedural benefits than any to which he was entitled as a non-tenured probationary employee. We are convinced from our review that Trejo failed to raise a genuine issue of material fact on his free speech or due process claims under the Federal Constitution or the Illinois Constitution. Accordingly, the administrators at the University of Illinois were entitled to summary judgment on each count of the complaint in this case.

The judgment of the district court is AFFIRMED.

FAIRCHILD, *Circuit Judge*, concurring. Plaintiff's complaint contained twelve counts. A magistrate judge considered pre-trial motions to dismiss and recommended dismissal without prejudice of Counts II and IX through XII, but denial as to other counts. The district judge granted the motions to dismiss the counts recommended, but with prejudice. The parties consented that the case proceed before the magistrate judge. Certain counts were withdrawn. Later the magistrate judge granted defendants' motion for summary judgment on the remaining counts, III (denial of procedural due process), IV (violation of substantive due process rights) and V (Section 1985(3)). I have no trouble affirming as to those counts. The undisputed facts shown on summary judgment disclose that defendants had acquired, without any violation of due process, knowledge of a pattern of conduct by plaintiff which they reasonably found unacceptable in a faculty member.

Count II is founded on the First Amendment to the federal constitution and Count IX on the constitution of Illinois. Viewed on its face Count II should not, in my opinion, have been dismissed. Separate analysis of Count IX is unnecessary now.

The gist of Count II is that plaintiff was an assistant professor of psychology; that he and a number of faculty, post-doctoral and graduate students who were attending a professional conference met at a bar in their hotel after the close of the day's scheduled activities; that they "engaged in a conversation precipitated by a public television broadcast dealing with the sexual behavior of non-human primates and the implications of that research for human sexual behavior", that plaintiff "opined, based upon said television broadcast and research, that there is a relationship between pregnancy, orgasms, and extra-marital affairs"; that the discussion was protected by the First Amendment; and that plaintiff's speech was a sub-

stantial and motivating factor in the defendants' decision not to reappoint him.

The magistrate judge, in recommending dismissal of Count II, concluded that "the social discussion to which plaintiff contributed in the hotel bar does not constitute a matter of public concern." He characterized the discussion as "casual" and compared it to the conversation considered in *Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir. 1990), finding it too remote from the marketplace of ideas. The district judge agreed that "the social discussion at the hotel bar did not involve a matter of public concern."

I do not agree. Plaintiff's theory may be bizarre, but as described in Count II it purported to be a theory in the field of psychology, offered by a person trained in that field to a group of others with similar training. It was far closer to the marketplace of ideas than the "employee grievance concerning internal office policy" considered in *Connick v. Myers*, 461 U.S. 138, 154 (1983) or the "conversation idle or flirtatious in character" considered in *Swank*. I do not think the fact that the statement was made in a bar or that the gathering was unplanned should make a difference.

Evidence of gestures and innuendos in plaintiff's conversation, later coming before the court in support of the motion for summary judgment, but not alleged in Count II, may well justify considering the bar episode in full context as part of plaintiff's pattern of conduct properly leading to non-reappointment, and defendants' answer would doubtless have so claimed if Count II had not been dismissed. I write separately to make the point that as a matter of pleading Count II should not have been dismissed.

No. 00-3341                                                      23

A true Copy:

    Teste:

                    _____

                    *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*