In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2680

SAMONE REDD,

*Plaintiff-Appellant*,

*v.*

ROSEMARIE NOLAN, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cv-00343—**Morton Denlow**, *Magistrate Judge.*

ARGUED SEPTEMBER 7, 2011—DECIDED NOVEMBER 29, 2011

Before POSNER, FLAUM, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Samone Redd's probationary employment with the Cook County Department of Corrections ended with her resignation on October 31, 2007. Redd had been a witness in a criminal investigation conducted by Detective John Dougherty of the City of Chicago Police Department. She has sued Dougherty, alleging that when she refused to lie to further the ends of that investigation, he tortiously interfered with her

County employment. She has also sued the County Sheriff and Sheriff's Department Director of Personnel Rosemarie Nolan (collectively, the "County"), claiming First Amendment retaliation, retaliatory discharge, and a violation of her procedural due process rights.[1] Her claims against Detective Dougherty were dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim in a ruling by Judge Ruben Castillo.[2] The claims that survived dismissal moved forward before Magistrate Judge Morton Denlow pursuant to the parties' consent. Judge Denlow granted the County's motion for summary judgment on all of Redd's remaining claims. Redd appeals both of these rulings. We affirm.

---

[1] Redd brought her retaliatory discharge claim only against the Sheriff, as her employer.

[2] Judge Castillo also dismissed all of Redd's claims against "unknown defendants," as well as a substantive due process claim against Director Nolan, claims of unspecified violations of her "First, Fourth, Sixth and/or Fourteenth Amendment" rights against Detective Dougherty and Assistant State's Attorney Adam Weber, and a claim of intentional infliction of emotional distress against all defendants. Redd does not appeal these rulings. She also does not appeal Judge Castillo's dismissal of her retaliatory discharge claim as to Director Nolan or her claim of intentional interference with a business relationship as to ASA Weber.

I. *Intentional Interference with a Business Relationship*

The district court dismissed the claim against Detective Dougherty for intentional interference with a business relationship. We review the dismissal under Rule 12(b)(6) de novo, accepting well-pled facts as true and drawing any reasonable inferences in Redd's favor. See *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). Additional background facts became available when the case progressed to summary judgment, but like the district court, we limit our review to the factual allegations Redd included in her first complaint.[3]

Redd began training to be a Cook County correctional officer on November 13, 2006, receiving her final evaluation from the Sheriff's Institute for Law Enforcement Education and Training on February 2, 2007. She then began work as a correctional officer for the Cook County Department of Corrections. All correctional officers must satisfy a one-year probationary period; Redd's probation was to end on November 13, 2007.

On May 29, 2007, Redd saw a man and a woman arguing outside of a Chicago residence. About two days later, she was contacted by Detective Dougherty, who asked her to give a statement about what she had seen on May 29th. She told him at that time that she had not

---

[3] Over the course of this litigation, Redd filed three complaints. Her tortious interference with a business relationship claim was dismissed based on the allegations in the first of her complaints, filed January 15, 2008, so that is the one we consider on appeal.

witnessed a battery, but she did not sign an official state-
ment. Redd alleges that Detective Dougherty, ap-
parently not satisfied with that statement, repeatedly
called her, attempting to intimidate and harass her.
On July 5, 2007, Dougherty called Redd at 3:00 a.m.,
demanding that she immediately give a statement in
person. Although Redd refused, Dougherty insisted
that she give a statement and cooperate. Hours later
Dougherty arrived at Redd's door with a subpoena
to appear and testify before a grand jury on July 6 and
July 9, 2007.

On July 6th, Redd was on her night-shift lunch break at
1:45 a.m. when she received a call from Detective
Dougherty advising her that he and Assistant State's
Attorney Weber were coming to the jail to obtain her
statement. When they arrived, however, DOC External
Operations Officers refused to let them enter the jail to
see Redd.

At 9:00 a.m. on July 6th, Redd appeared for the
grand jury proceedings pursuant to her subpoena.
ASA Weber tried to get Redd to change her statement
by intimidation and coercion, she alleges, falsely
accusing her of making inconsistent statements. Redd
refused to lie and did not testify before the grand jury.
This scene was repeated on July 9th, except that
Detective Dougherty was also present when ASA
Weber attempted to bully Redd into changing her state-
ment.

ASA Weber later filed a complaint against Redd with
the County Sheriff's Department accusing her of failing

"to cooperate in an ongoing criminal investigation" and of "providing the State's Attorney's Office with false statements." Redd alleged in conclusory terms that Detective Dougherty conspired with ASA Weber to interfere with her employment relationship. As a result of ASA Weber's accusations, Redd alleges, Sheriff's Department Director of Personnel Rosemarie Nolan "terminated and/or constructively discharged" Redd from her job as a DOC correctional officer on October 31, 2007.[4]

Detective Dougherty moved to dismiss Redd's claim of tortious interference with a business relationship under Rule 12(b)(6) for failure to state a claim. To defeat Detective Dougherty's motion, Redd had to do more than allege the elements of her claim. Her complaint "must actually *suggest* that [she] has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008) (emphasis in original), quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). Her complaint was required to provide at least "enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting her allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). But this requirement

---

[4] For the sake of clarity, we note again that Redd initially brought claims of tortious interference with a business relationship under Illinois law against both Weber and Dougherty. The court dismissed Redd's claim against Weber on sovereign immunity grounds. Redd has not appealed that decision.

does not mean that the plaintiff was required to show that she would probably prevail. A well-pleaded complaint "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id*. (internal quotation omitted).

To establish the tort of intentional interference with a business relationship under Illinois law, a plaintiff must show (1) a reasonable expectation of continued employment; (2) knowledge of the business relationship by the defendant; (3) intentional interference; and (4) damages. See *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk and Western Ry. Co*, 748 N.E.2d 153, 161 (Ill. 2001); *Labate v. Data Forms, Inc.*, 682 N.E.2d 91, 94 (Ill. App. 1997). The district court found that Redd's claim against Dougherty failed on the third element because Redd alleged that ASA Weber, and not Detective Dougherty, filed the complaint against her with the Sheriff's Department, and because nothing else in Redd's allegations suggested that Detective Dougherty was involved with or participated in ASA Weber's complaint. We agree with this reasoning.

Redd's allegations certainly suggest that Detective Dougherty did his best to pressure Redd into telling him what he and ASA Weber wanted to hear. But Redd also alleged that ASA Weber, and only ASA Weber, raised a complaint with her employer. Redd has failed to allege a viable claim against Detective Dougherty under the post-*Twombly* standards of Rule 8. She attempts to draw Detective Dougherty into the mix by claiming that

he and ASA Weber "individually and/or in a conspiracy, intentionally interfered with [Redd's employment] by inducing the Cook County Department of Corrections to discharge Plaintiff," but her attempt falls short. Her assertion of a conspiracy is an unsupported legal conclusion that we are not bound to accept as true. See, *e.g.*, *Kolbe & Kolbe Health & Welfare Benefit Plan v. Medical College of Wisconsin, Inc.*, 657 F.3d 496, 502 (7th Cir. 2011). The complaint includes not a whiff of a conspiratorial agreement or any improper complicity between Weber and Dougherty to support the conclusory allegation. Taking Redd's allegations as a whole, we cannot reasonably infer that Detective Dougherty was involved in ASA Weber's complaint or that he otherwise intentionally interfered with Redd's employment. We therefore affirm the district court's dismissal of the claim against Detective Dougherty.

## II. *Retaliation Claims*

The County sought summary judgment on Redd's claims of First Amendment retaliation and state law retaliatory discharge. The Magistrate Judge granted the County's motion on these two claims, and Redd appeals. We review the court's grant of summary judgment de novo, and we view the designated evidence and draw all reasonable inferences therefrom in the light reasonably most favorable to Redd as the non-moving party. See *Poer v. Astrue,* 606 F.3d 433, 438-39 (7th Cir. 2010). Summary judgment is appropriate only when

the pleadings, discovery materials, disclosures, and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The specifics of ASA Weber's complaint and the County's ensuing investigation were not part of Redd's complaint allegations and thus could not be considered by the court in deciding Dougherty's and the City's motion to dismiss, but these additional facts could and did come into play with the County's summary judgment motion. On May 29, 2007, Redd attended a barbeque at which she witnessed a verbal altercation between her friend Tammie Watkins and Raphael Taylor. Watkins later accused Taylor of striking her in the face with a beer bottle. Chicago Police sought corroboration of Watkins' story from Redd, whom they considered a "circumstantial witness" to the crime.

Chicago Police Detective Brian Johnson investigated the Watkins battery alongside Detective Dougherty. Detective Johnson testified that on June 7, 2007, Redd told him that she had met with Taylor after the incident, and that Taylor told Redd that he was sorry and he "didn't mean to do that to Tammie." Redd did not see or sign the report that Johnson created memorializing her supposed statement. Detectives Johnson and Dougherty began looking for Taylor, and Redd rode along with them to help find him, giving Johnson and Dougherty possible addresses and a license num-

ber to assist them. Detective Johnson testified that up to that point, Redd was cooperative.

But after Taylor was arrested on July 4, 2007, Detective Johnson believed that Redd became difficult and stopped cooperating. First, she refused to go to the police station to view a line-up. Then, on July 5th, Detective Johnson and Assistant State's Attorney Kevin Nolan attempted to speak with Redd at the Cook County Jail during her shift, but they were not allowed to enter. (Redd's supervisor later explained that External Operations and the Administrative Duty Officer determine who is and who is not allowed to enter the jail, and that Redd was not involved in the decision to exclude Detective Johnson and ASA Nolan.) Redd was subpoenaed to appear before a grand jury on July 6th and 9th. On July 6th, Redd called the phone number on the subpoena because she was confused about the date she should appear. She spoke to ASA Weber, who asked her when she would like to appear. Redd stated she would come right then because she was at work. She arrived in ASA Weber's office, but Weber decided against putting her on the witness stand. Redd returned to Weber's office again on July 9th, but Weber again declined to call her to testify.

The Sheriff's Office of Professional Review received a complaint from ASA Weber alleging that Redd had purposely failed to cooperate in a criminal investigation of the alleged aggravated battery committed against Watkins. The Sheriff's Department's General Orders controlled how internal investigations were handled.

Section (III), D, 2 of General Order 4.1 detailed the author-
ity and responsibility of the Internal Investigations Divi-
sion in handling complaints concerning correctional
department officers:

> Disciplinary action in connection with "sustained"
> complaints is initially recommended by the assigned
> Internal Investigations Investigator. The Chief In-
> vestigator will review the investigator's findings and
> recommendation(s), then submits the investigation
> for Command Channel Review. Command Channel
> Review consists of the Inspector General, Under-
> sheriff, Executive Director, and in cases where there
> is recommendation for termination, the Sheriff.

Detective Servando Velez was assigned to conduct an
administrative investigation of ASA Weber's complaint.
He interviewed Weber, Detective Johnson, ASA Nolan,
and Redd. Redd denied that Raphael Taylor had
admitted to her that he hit Tammie Watkins. Instead,
Redd told Detective Velez that she had spoken not to
Taylor but to Taylor's girlfriend. She also told Detective
Velez that she had been unable to come to police head-
quarters to view a line-up on July 5th because her child
had been at home asleep. When he was interviewed,
Detective Johnson told Detective Velez that Redd had
become "difficult" and did not want to cooperate in the
investigation after Taylor was arrested. She had told
Detective Johnson that she did not want to be involved,
and she refused to view a line-up because her super-
visor had told her not to become involved. When Redd
failed to meet with the police, the decision was made

to subpoena her to testify before the grand jury. Detective Johnson told Detective Velez that ASA Weber decided not to call Redd to testify before the grand jury because of her inconsistent statements.

In conducting his investigation into ASA Weber's complaint, Detective Velez did not request the police detectives' reports or progress notes as part of his investigation. He did not interview External Operations or Redd's supervisor at the Cook County Jail. When asked whether he believed the information provided to him by the police detectives, Velez responded: "I believe a police officer is going to be truthful in his statement." He also stated that he "absolutely" believed the Assistant State's Attorneys were being truthful with him.

Detective Velez completed his investigation on October 4, 2007, ultimately sustaining the following charges against Redd:

(1) that she "failed to cooperate with Chicago Police Detectives and Assistant State's Attorneys investigating an Aggravated Battery on 06 July 2007" in violation of General Order 3.8 (III) B, 4;

(2) that she contradicted her prior statements to detectives and changed the facts after three interviews in violation of General Order 3.8 (III) B, 4;

(3) that she "provided contradictory statements to both Detectives and ASAs assigned to investigate an Aggravated Battery" in violation of General Order 3.8 (III) B, 6;

(4) that she "refused to speak with Det. Dougherty and ASA Nolan . . . and impeded their investigation" in violation of General Order 3.8 (III) B, 6; and

(5) that she "reported three hours late to a Grand Jury subpoena after being given appropriate notice and proceeded to give conflicting statements" in violation of General Order 3.8 (III) B, 6.

General Order 3.8 (III) B, 4 required employees to "respect and protect the right of the public to be safeguarded from criminal activity." General Order 3.8 (III) B, 6 required employees to "respect the importance of agencies within the criminal justice system and work to improve coordination within each segment." Based on the outcome of Velez's investigation, Henry Barsch, the Assistant Executive Director of the Office of Professional Review, recommended that Redd be terminated.

On October 31, 2007, Redd met with defendant Rosemarie Nolan, the Director of Personnel of the Sheriff's Department. Nolan advised Redd of the charges against her and the General Orders she was found to have violated. She also told Redd that if she did not resign, she would be discharged for misconduct. Redd chose to resign. On November 6th, an Executive Director of the DOC concurred with OPR's findings and recommendation of termination. On November 9th, an OPR Executive Director concurred with OPR's findings and recommendation of termination. The Undersheriff concurred on November 16, and on November 21st, the Sheriff concurred with OPR's findings and recommendation of termination. Director Nolan testified that

she lacks the authority to disagree with or reverse a discharge decision.

Redd contends that she was discharged in violation of her First Amendment rights in retaliation for refusing to commit perjury. To establish a prima facie case of First Amendment retaliation, an employee must show that: (1) the employee's speech was constitutionally protected; (2) the employee has suffered a deprivation likely to deter free speech; and (3) the employee's speech was a motivating factor in the employer's decision. See *Greene v. Doruff*, ___ F.3d ___, ___, 2011 WL 4839162, at *2 (7th Cir. Oct. 11, 2011), following *Spiegla v. Hull*, 371 F.3d 928, 941-43 (7th Cir. 2004); *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 670 (7th Cir. 2009).

Redd also claims retaliatory discharge under Illinois law, which is a narrow exception to the rule that an employer may fire an at-will employee for any reason or no reason. To establish a claim of retaliatory discharge, an employee must establish that she was (1) discharged; (2) in retaliation for her activities; and (3) the discharge violated a clear mandate of public policy. See *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009). If Redd had been discharged for refusing to commit perjury, that would be a recognized violation of public policy under Illinois law. See *id.*

We consider Redd's retaliation claims together because each failed on summary judgment for the same reason: Redd lacks evidence from which a reasonable jury could infer that she was asked to resign in retaliation for refusing to commit perjury before the grand jury.

Redd's argument misses the mark. She contends that summary judgment was not appropriate because only a jury could determine whether the County's stated reason for her termination — violations of department rules and regulations — was credible. In support of her contention, she points only to Detective Velez's statements that, in conducting his investigation, he believed "a police officer [would] be truthful in his statement" and that he "absolutely" believed the Assistant State's Attorneys were being truthful with him. For these reasons, Redd contends that Velez was "neglectful" of the possibility that those officers and ASAs might lie (or be honestly mistaken). Without significantly more evidence to undermine the honesty of Velez's account, however, Redd has at most an argument that Velez was gullible or naive. Employment actions based on gullible or naive reasoning or otherwise bad judgment are not illegal for that reason.

What is missing here is any evidence from which a reasonable jury might conclude that Detective Velez's investigation or conclusions were in retaliation for Redd's asserted refusal to lie to further the prosecution of Raphael Taylor in the Watkins battery. In other words, even if Velez's conclusions were wrong, that would not support an inference that he or other DOC officials intended to retaliate against Redd for exercising her rights under the First Amendment and Illinois law.

Even if we were to take a speculative leap and assume that Detective Velez himself harbored a retali-

atory motive, Redd has another hurdle to overcome. Detective Velez did not participate in the decision to terminate Redd's employment — and, other than delivering the news, neither did Director Nolan. Henry Barsch, the Assistant Executive Director of the Office of Professional Review, was the one who reviewed the results of Detective Velez's investigation and recommended that Redd be separated from her employment. Even if Velez's investigation could somehow be categorized as retaliatory, Redd does not argue that Barsch was Velez's "cat's paw," and nothing in this record suggests that any retaliatory motive trickled up to Barsch, the decision-maker. See, *e.g.*, *Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1192 (2011) (under "cat's paw" theory of liability, employer will be liable for discrimination where an adverse action taken by a decision-maker is "the intended consequence" of a non-decision-maker's "discriminatory conduct"). In short, there is no evidence that would support a reasonable finding of illegal retaliation in this summary judgment record.

III. *Procedural Due Process*

Finally, we turn to Redd's claim that the County defendants violated her right to procedural due process. The Magistrate Judge also granted the County's motion for summary judgment on this claim, and here again we review the court's grant of summary judgment de novo, viewing all evidence and drawing all reasonable inferences therefrom in the light reasonably most favorable to Redd as the non-moving party. See *Poer*, 606 F.3d at 438-39.

A procedural due process violation occurs when (1) conduct by someone acting under the color of state law; (2) deprives the plaintiff of a protected property interest; (3) without due process of law. See *Germano v. Winnebago County*, 403 F.3d 926, 927 (7th Cir. 2005). Whether Redd had a property interest in continued employment depends on state law. See *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Germano*, 403 F.3d at 927. To show a legitimate expectation of continued employment under Illinois law that could support a due process claim, Redd must point to a state law, an ordinance, a contract, or some other understanding limiting the Sheriff's ability to discharge her. See *Krecek v. Board of Police Comm'rs of La Grange Park*, 646 N.E.2d 1314, 1318-19 (Ill. App. 1995).

Redd was still within her probationary period when her employment ended, so this determination seems deceptively easy. It is well-settled that probationary public employees do not possess a property interested in continued employment and thus have no right to procedural due process before their employment may be terminated. See *Williams v. Seniff*, 342 F.3d 774, 787 (7th Cir. 2004) (Indiana law established a term of one year of probation for county police officers; officer fired within probationary period had no protected interest in continued employment); *Omosegbon v. Wells*, 335 F.3d 668, 674-75 (7th Cir. 2003) (no protected interest in reappointment to a "probationary" Indiana state university teaching position); *Trejo v. Shoben*, 319 F.3d 878, 889 (7th Cir. 2003) (same, in Illinois); *Common v. Williams*, 859 F.2d 467, 470-71 (7th Cir. 1988) (Illinois corrections officer fired

within probationary period had no protected interest in continued employment). The Illinois legislature has even codified this principle specifically for county corrections officers: "All appointees shall serve a probationary period of 12 months and during that period may be discharged at the will of the Sheriff." 55 ILCS § 5/3-7008.

But the issue turns out not to be quite so simple, at least with regard to probationary employees of the Cook County Department of Corrections. Despite the quoted statutory language, "a municipality can provide greater protection for its employees if it sees fit to do so by enacting rules and regulations." *Lewis v. Hayes*, 505 N.E.2d 408, 411 (Ill. App. 1987). For such a rule or regulation to be effective, however, it must be a "clear policy statement." *Faustrum v. Board of Fire and Police Comm'rs of the Village of Wauconda*, 608 N.E.2d 640, 643 (Ill. App. 1993). When Redd finished her training and started working as a correctional officer, she signed a document as part of her employment paperwork. By its terms, the document stated Redd's "terms of employment." By signing the document, she confirmed that she would abide by the DOC's General Orders and Procedures. She also confirmed that she understood "that during my first year as a Correctional Officer, *I am on probation and can be terminated for cause*." (Emphasis added.) The question before us is whether this is a "clear policy statement" sufficient to alter the ordinary at-will terms of Redd's probationary employment.

Redd argues that the "termination for cause" language in her employment agreement meant that the DOC had

altered the meaning of probationary employment so that she could be terminated *only* for cause, so that she had a protected interest in continued employment with the DOC. Redd finds support for this position in *Lewis v. Hayes*, in which a panel of the Illinois Appellate Court accepted a similar argument and held that a probationary police officer had a property interest in his job because the local government had adopted rules saying that a probationary employee could be terminated for cause: "If a probationary officer could be terminated either with cause or without, the 'with cause' language would have no meaning whatsoever, and we can not assume that the Village would draft meaningless language and insert it into its Commission's Rules." 505 N.E.2d at 411.

We are not persuaded that the reasoning of *Lewis* is sufficient to satisfy the later "clear policy statement" requirement that has emerged under Illinois law as the condition of overcoming the clear statutory language providing that probationary employees may be fired without cause. First, it simply is not "meaningless" to tell an employee that she may be fired for cause or to specify some of the particular causes, even if the employer does not intend to limit its discretion to fire an employee without good cause (meaning without judicial review). It may be useful for both employer and employee for the employer to communicate expectations for performance, and to remind the employee of the consequences of poor performance. The legal nuances of providing such a warning need not be spelled out in detail, particularly where the employ-

ment relationship is governed by statute, as it is here in the case of probationary corrections employees.

Even more to the point, however, we do not see how we could reconcile the promise that *Lewis* found to be only implied (to fire *only* for good cause) with the requirement of a clear policy statement to overcome the statute providing for truly probationary employment. See *Krecek*, 646 N.E.2d at 1319; *Faustrum*, 608 N.E.2d at 643 (allowing termination of probationary police officer without notice or hearing). The clear statement requirement can be traced back at least to *Romanik v. Board of Fire and Police Comm'rs of East St. Louis*, 338 N.E.2d 397 (Ill. 1975), in which the Illinois Supreme Court drew a sharp line between regular police officers with for-cause protection and probationary officers who had not yet proven their abilities on the job. There the state's highest court refused to read a statute requiring pre-termination procedures as applying to probationary officers in the absence of specific language requiring application to them. *Id.* at 399. The clear statement requirement simply is not satisfied by an inference that lawyers and judges might draw from at best ambiguous and incomplete language.

Accordingly, in similar cases involving state and local government employees in Illinois, we have found that there was no clear statement overcoming statutory provisions for truly probationary employment. See, *e.g.*, *Border v. City of Crystal Lake*, 75 F.3d 270, 275 (7th Cir. 1996) (affirming summary judgment for employer and finding no property interest where employer specified some grounds

for termination but did not clearly indicate that those were only grounds for termination); *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1347-48 (7th Cir. 1995) (affirming summary judgment for employer and finding no property interest where contract and policies did not say that employee's contract could be terminated only for good cause); see also *Moss v. Martin*, 473 F.3d 694, 701 (7th Cir. 2007) (affirming summary judgment for employer; permissive language in manual that employee "may be discharged for cause" did not imply promise that discharge could be only for good cause); *Boulay v. Impell Corp.*, 939 F.2d 480, 482-83 (7th Cir. 1991) (affirming summary judgment for employer; permissive language in employee handbook did not guarantee either progressive discipline or "just cause" for dismissal).

The language in the employment agreement cannot be read in a vacuum. Properly read in context with the statute and other DOC rules and regulations concerning DOC employee status and discipline, the single line in Redd's employment agreement stating that she could "be terminated for cause" is not a sufficiently clear statement that she could be fired only for cause to give Redd a protected property interest in her probationary employment.

The DOC General Orders and Procedures, which Redd acknowledged were also binding on her employment, stated: "All probationary employees (person employed by the Department less than 12 months) may be summarily terminated by the Sheriff or his designee." DOC General Order 3.2A. They also stated:

> All probationary correctional officers serve a probationary period of (1) year, from the date of appointment. After successful completion of the probationary period, officers are granted full merit status. . . .
>
> Failure to meet minimum standards of performance may be basis for termination of a probationary employee at any time during the probationary period. If it becomes apparent that the probationary officer's conduct, character or standards of performance do not meet Sheriff's Office standards for satisfactory service, the probationary officer may be removed.

DOC General Order 3.5. When the relevant documents are read together, we find no clear statement that the DOC intended to alter the terms of Redd's employment by stating in her employment agreement that she could be terminated for cause. It is not difficult to reconcile the General Orders and the "termination for cause" language in Redd's employment agreement: although Redd certainly could have been terminated for cause, she also could have been terminated without cause. In either case, the Sheriff retained the right to terminate Redd "summarily" so long as she was within her probationary period.

To support her claim to a protected property interest in her probationary job, Redd also relies on procedural provisions of department policies. Redd points to DOC General Order 4.1, which described how complaints, internal investigations, and disciplinary actions within the department should be conducted. She contends that

this General Order "specifie[d]" that probationary employees accused of misconduct had the "right" to an investigation before they were disciplined. The language of General Order 4.1 does not support her contention.

More fundamental, even if Redd could show a promise that certain procedures would be available to her before termination, it is well established that such procedural protections under state law do not provide the substantive restrictions on the employer's discretion that would be needed to establish a federally protected property interest in continued employment. See, *e.g.*, *Border*, 75 F.3d at 275 (presence of grievance procedures in employee handbook did not indicate that plaintiff's employment could be terminated only "for cause"); *Campbell v. City of Champaign*, 940 F.2d 1111, 1113 (7th Cir. 1991); *Lim v. Central DuPage Hospital*, 871 F.2d 644, 648 (7th Cir. 1989); *Schultz v. Baumgart*, 738 F.2d 231, 236 (7th Cir. 1984) (employee's federal due process claim did not depend on whether local government employer complied with every detail of state law's procedural requirements).[5]

---

[5] Several Illinois state cases seem to conclude that state law requirements for procedural protections of employees are sufficient to create a property interest protected by the federal Due Process Clause. See, *e.g.*, *Krecek*, 646 N.E.2d at 1319; *Faustrum*, 608 N.E.2d at 641-43; *Lewis*, 505 N.E.2d at 411. Such procedural requirements are often enforceable as a matter of state law. *E.g.*, *Fernandes v. Nolen*, 592 N.E.2d 1151, 1153 (Ill. App. 1992) (probationary state police officer was entitled to pre-termination hearing where agency rules (continued...)

To show a protected property interest in her probationary employment, Redd also relies on Director Nolan's deposition. Nolan testified that probationary employees could be terminated only for "just cause" and that the Sheriff could terminate a probationary employee if there was a "reason for discharge." Nolan's testimony was confused and inconsistent. She also testified that her understanding of "fired for just cause" meant that an employee could be discharged for any reason at the discretion of the employer. Although we must resolve that confusion and inconsistency in Redd's favor on summary judgment, it does not help her. No matter what Nolan believed, she was not able to alter unilaterally the terms of Redd's employment. Thus, what Nolan may or may not have understood in that regard was not relevant to Redd's actual legal status. See *Common*, 859 F.2d at 471-72 (DOC executive director lacked the authority to vary the terms of an employee's probationary employment).

Accordingly, we conclude that the sentence in Redd's employment agreement saying that she could be terminated for cause was not a sufficiently "clear policy statement" to override the mandate of 55 ILCS § 5/3-7008 that county correctional officers may be terminated summarily for any reason during their probationary

---

[5] (...continued)

required one). But the cases cited in the text (and innumerable others that could be cited on the point) show that state procedural requirements for termination do not provide a *federally* protected property interest in continued employment.

period. Because Redd was still within her 12-month probationary period, she had no protected interest in continued employment at the time of her resignation.

Finally, Redd argues that Nolan "defrauded" her into resigning on October 31st (while she was still within her probationary period) because the Sheriff did not actually approve her termination until November 21st. On October 31st, Nolan told Redd that if she did not resign she would be fired, and Redd claims that she resigned in reliance on Nolan's statement. She contends that if she had waited, her termination would not have been effective until November 21st when the Sheriff approved her termination. However, Redd did not plead a fraud claim. Even if she had, her argument is pure speculation. No one knows what would have happened, or when, if Redd had not resigned on October 31st. The fact that the Sheriff did not formally sign off on Redd's termination until November 21st could not retroactively change Redd's status on October 31st. We affirm the grant of summary judgment on the due process claim.

The judgment of the district court is AFFIRMED.