**Thomas OSTEEN, Plaintiff–Appellant,**

v.

**Barbara HENLEY, in her personal capacity and also in her official capacity as Vice President for Student Affairs of Northern Illinois University, et al., Defendants–Appellees.**

No. 93–1151.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1993.

Decided Dec. 30, 1993.

T. Jordan Gallagher, William P. Brady, Kurt Peter Klein, Gallagher, Klein & Brady, DeKalb, IL, Howard R. Wertz, Lynwood, IL (argued), for plaintiff-appellant.

Gregory K. Harris, Asst. U.S. Atty., Giffin, Winning, Cohen & Bodewes, Springfield, IL (argued), George M. Shur, Northern Illinois University University Legal Counsel, De-Kalb, IL, for defendants-appellees.

Before POSNER, Chief Judge, MANION, Circuit Judge, and FOREMAN, District Judge.*

POSNER, Chief Judge.

Late one night, as Thomas Osteen, an undergraduate at Northern Illinois University, was leaving a bar in the company of two male friends and the girlfriend of one of them, the girlfriend began "mouthing off to a male [another student] who was outside of a bar who decided to mouth off to her and the two of them mouthed out to each other and he didn't realize she was with three football players so when he realized that he was mouthing off to a young lady that was being accompanied by three football players one of

---

* Hon. James L. Foreman of the Southern District of Illinois, sitting by designation.

which was her boyfriend, it was a little bit too late for him." (We are quoting, not Gertrude Stein, but one of the defendants, university judicial officer Larry Bolles.) "I'm told without one word, Mr. Osteen, not one word out of his mouth he stomps this guy in the head with some cowboy boots. This is what the guy said, he had on some boots and he stomped him." Osteen's kick or stomp broke the other student's nose. Another student, apparently a friend of the one whom Osteen had just assaulted, approached Osteen, who again without a word "broke his face with one punch." Osteen had broken his second nose for the night. The incident, aggravated in Bolles's mind by the fact that the woman whose honor Osteen was defending in this violent manner was not even Osteen's own girlfriend, led to Osteen's expulsion for two years and to this lawsuit (dismissed by the district court), in which Osteen challenges the expulsion as a deprivation of property without due process of law, in violation of the Fourteenth Amendment. Although it is an open question in this circuit whether a college student as distinct from an elementary school or high school student has a property right in continued attendance, *Akins v. Board of Governors*, 840 F.2d 1371, 1376 (7th Cir.1988), vacated on other grounds, 488 U.S. 920, 109 S.Ct. 299, 102 L.Ed.2d 319 (1988), the defendants have not raised it, so we shall not attempt to answer it.

■ The suit is against a variety of university officials in both their individual and official capacities and seeks both injunctive relief—the reinstatement of Osteen with or without the restoration of his football scholarship—and damages. If the request for injunctive action were the only thing before us, we would be inclined to remand for a hearing on possible mootness. We were told at argument that after being expelled from NIU Osteen enrolled in another college, and for all we know he will have received his degree from that college before he could possibly be readmitted to NIU. (The record is silent as to what year of college Osteen was in when he was expelled.) More important, the expulsion was only for two years, and the two years are up, so that there is, at least as far as the record discloses, no obstacle to his being readmitted. But since the entire case would not be moot even if the injunctive aspect of it were, we shall soldier on, merely adding that the district court was incorrect to bypass the issue of standing and deny injunctive relief on the ground that such relief is barred by the Eleventh Amendment. That amendment is not a bar to injunctions against state officials even when they are named in their official capacities, because all that such an injunction does is require the state to confine its future activity within the limits set by federal law. *Kentucky v. Graham*, 473 U.S. 159, 169 n. 18, 105 S.Ct. 3099, 3107 n. 18, 87 L.Ed.2d 114 (1985); *Kroll v. Board of Trustees*, 934 F.2d 904, 908 (7th Cir.1991). The immunity that the Eleventh Amendment grants does not go so far as to allow state officials to ignore federal law with impunity.

■ But insofar as the defendants are being sued for damages in their official capacities, the suit is against the university and if the university is the state is therefore barred by the Eleventh Amendment. *Kentucky v. Graham, supra*, 473 U.S. at 165–66, 105 S.Ct. at 3105. Northern Illinois University is an Illinois state university. *Cannon v. University of Health Sciences*, 710 F.2d 351, 356 (7th Cir.1983), held that Southern Illinois University, another Illinois state university, is an arm of the state and *Davidson v. Board of Governors*, 920 F.2d 441, 442 (7th Cir. 1990), held (though without discussion) that Western Illinois University is too; and while we later ducked the question whether NIU is, *Benning v. Board of Regents*, 928 F.2d 775, 777 (7th Cir.1991), we failed in doing so to cite either *Cannon* or *Davidson*.

Despite the similarity in their names, these three universities have separate provenances and are governed by separate statutes. 110 ILCS 505, 605, 705. But as Osteen has pointed us to no difference in their governance that might bear on the Eleventh Amendment, he has the uphill fight of persuading us that *Cannon* and *Davidson*— which are consistent with decisions concerning other state universities, as noted in *Kroll v. Board of Trustees, supra*, 934 F.2d at 908 n. 2, and *Benning v. Board of Regents, su-*

*pra,* 928 F.2d at 777—are wrong and should be overruled. He points to the provision of the Illinois constitution of 1970 that "except as the General Assembly may provide by law, sovereign immunity in this State is abolished." Ill. Const. art. XIII, § 4. Later, however, the legislature immunized the state, expressly including universities belonging to the "Regency Universities System," from suit other than in the Illinois Court of Claims. 705 ILCS 505/8(d); *Kroll v. Board of Trustees, supra,* 934 F.2d at 910. And Northern Illinois University is one of those universities. 110 ILCS 705/1; *Benning v. Board of Regents, supra,* 928 F.2d at 777–79. Osteen argues that this legislation creates merely a "procedural" bar to suit in any state court other than the court of claims, leaving federal jurisdiction unaffected. In effect he is arguing that a state cannot waive its sovereign immunity in part; if the state doesn't want to be sued in federal court, it can't establish a court of claims to hear suits against it. But since a state can waive its sovereign immunity to suit in its own courts without thereby being deemed to have waived its Eleventh Amendment immunity to suit in federal court, *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985); *Kroll v. Board of Trustees, supra,* 934 F.2d at 907–10, we cannot see why a state cannot confine damages suits against itself to a particular state court.

Insofar as the defendants are also being sued for damages in their individual capacity, the Eleventh Amendment does not bar the suit. Almost certainly, qualified immunity does. (Conceivably, absolute immunity is available to the university's judicial officers, though this is most unlikely given the Supreme Court's refusal to grant such immunity to members of school boards that adjudicate violations of school disciplinary regulations, *Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975), and to members of prison disciplinary committees, *Cleavinger v. Saxner,* 474 U.S. 193, 204–06, 106 S.Ct. 496, 502–03, 88 L.Ed.2d 507 (1985).) But as the alleged violations of Osteen's constitutional rights occurred just a couple of years ago and there have been no pertinent legal changes since, the issue of qualified immunity merges with the merits,

*Mahoney v. Kesery,* 976 F.2d 1054, 1057–59 (7th Cir.1992)—to which we turn at last.

Bolles mailed Osteen a notice of charges and a copy of the university's student judicial code, thus initiating disciplinary proceedings. According to the code, Bolles's function as university judicial officer was to meet with Osteen and attempt to resolve the matter without a hearing, but if this failed he was to present the case against Osteen at a hearing. The two met and in Bolles's presence Osteen signed a form in which he pleaded guilty to the charges but requested a hearing on Bolles's proposed sanction, which was a two-year expulsion. The hearing was held before an appeals board consisting of the university's assistant judicial officer (i.e., assistant to Bolles) presiding and in addition one faculty member and two students. The case against Osteen was presented by Bolles, Osteen being represented by a student advocate. Osteen, his advocate, and Bolles addressed the board (we quoted part of Bolles's statement earlier), which in addition considered character references and other documents and concluded that the two-year expulsion was the proper sanction. Osteen attempted to appeal to the university's vice-president for student affairs but was told that the vice-president's authority under the judicial code had been delegated to an associate vice-president. After considering Osteen's appeal that officer upheld the expulsion but postponed it to the end of the semester.

The suit attacks a number of features of the disciplinary proceeding. Bolles had played a dual role as judge and prosecutor. The presiding officer of the appellate tribunal was Bolles's assistant. She cut off Osteen's advocate on the ground that the issue of guilt was not before the board, just the issue of sanction, when the advocate was trying to give Osteen's version of the assaults. Osteen was not allowed to cross-examine. His lawyer (his real lawyer, not the student advocate) was not permitted to participate in the proceedings. At the oral argument before us Osteen's counsel repeated, what had been in his complaint but not in his briefs, the alarming further charge that Bolles had induced Osteen to plead guilty on the representation that on appeal the two-year expulsion would

be rescinded—then (as we know) turned around and argued passionately to the appeals board for expulsion.

■ In his opening brief in this court Osteen raised just three issues; the others are therefore waived, and we will not consider them. The issues he raised are the defendants' failure to comply with all the requirements of the student judicial code, the interruption of himself and his advocate by the appeals board, and the denial of a right to counsel. The first point has no possible merit. As we tirelessly but unavailingly remind counsel in this court, a violation of state law (for purposes of this case the student judicial code may be treated as a state law) is not a denial of due process, even if the state law confers a procedural right. See, e.g., *Archie v. City of Racine,* 847 F.2d 1211, 1215–17 (7th Cir.1988) (en banc); *Evans v. City of Chicago,* 10 F.3d 474, 480–81 (7th Cir.1993) (en banc) (plurality opinion), and cases cited there; and with particular reference to this case *Campbell v. City of Champaign,* 940 F.2d 1111, 1113 (7th Cir.1991). The standard of due process is federal. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985).

■ As for the interruption of his student advocate, Osteen had by pleading guilty to the charges against him conceded his guilt, so the presiding officer was entitled to cut off what appeared to be an attempt to reopen the issue. Osteen was allowed to make a statement in mitigation; his advocate was interrupted only when it appeared that she was trying to revisit the issue of guilt. The interruption, designed to confine the proceeding to relevant matters, was well within the outer bounds of the presiding officer's discretionary authority over the scope of the hearing—and it is the outer bounds that the due process clause patrols.

■ The most interesting question is whether there is a right to counsel, somehow derived from the due process clause of the Fourteenth Amendment, in student disciplinary proceedings. An oldish case (by the standards of constitutional law at any rate) says yes, *Black Coalition v. Portland School*

*District No. 1,* 484 F.2d 1040, 1045 (9th Cir.1973), but the newer cases say no, at most the student has a right to get the advice of a lawyer; the lawyer need not be allowed to participate in the proceeding in the usual way of trial counsel, as by examining and cross-examining witnesses and addressing the tribunal. E.g., *Newsome v. Batavia Local School Dist.,* 842 F.2d 920, 925–26 (6th Cir.1988); *Gorman v. University of Rhode Island,* 837 F.2d 7, 16 (1st Cir.1988). Especially when the student faces potential criminal charges (Osteen was charged with two counts of aggravated battery; the record is silent on the disposition of the charges), it is at least arguable that the due process clause entitles him to consult a lawyer, who might for example advise him to plead the Fifth Amendment. *Id.* at 16. In fact *Gabrilowitz v. Newman,* 582 F.2d 100, 105–07 (1st Cir. 1978), so holds, though over a dissent which points out that the Supreme Court had rejected the same argument in the parallel context of prison disciplinary proceedings. *Baxter v. Palmigiano,* 425 U.S. 308, 315, 96 S.Ct. 1551, 1556, 47 L.Ed.2d 810 (1976).

Even if a student has a constitutional right to *consult* counsel—an issue not foreclosed by *Baxter,* as we shall see—we do not think he is entitled to be represented in the sense of having a lawyer who is permitted to examine or cross-examine witnesses, to submit and object to documents, to address the tribunal, and otherwise to perform the traditional function of a trial lawyer. To recognize such a right would force student disciplinary proceedings into the mold of adversary litigation. The university would have to hire its own lawyer to prosecute these cases and no doubt lawyers would also be dragged in—from the law faculty or elsewhere—to serve as judges. The cost and complexity of such proceedings would be increased, to the detriment of discipline as well as of the university's fisc. Concern is frequently voiced about the bureaucratization of education, reflected for example in the high ratio of administrative personnel to faculty at all levels of American education today. We are reluctant to encourage further bureaucratization by judicializing university disciplinary proceedings, mindful also that one dimension of academic freedom is the right of academic

institutions to operate free of heavy-handed governmental, including judicial, interference. *Piarowski v. Illinois Community College Dist. 515*, 759 F.2d 625, 629 (7th Cir. 1985), and cases there. The danger that without the procedural safeguards deemed appropriate in civil and criminal litigation public universities will engage in an orgy of expulsions is slight. The relation of students to universities is, after all, essentially that of customer to seller. That is true even in the case of public universities, though they are much less dependent upon the academic marketplace than private universities are. Northern Illinois University can't have been happy to lose a student whom it had wanted so much that it had given him a football scholarship, and who had made the team to the greater glory of the institution.

The canonical test for how much process is due, laid down by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and applied to school or college disciplinary proceedings in such cases as *Newsome* and *Gorman*, requires consideration of the cost of the additional procedure sought, the risk of error if it is withheld, and the consequences of error to the person seeking the procedure. The cost of judicializing disciplinary proceedings by recognizing a right to counsel is nontrivial, while the risk of an error—specifically the risk that Osteen was unjustly "sentenced"— is rather trivial. Not only has the university, as we have said, no incentive to jerry-rig its proceedings against the student—and there is no indication of that here, for even permanent expulsion would not have been an excessive sanction for Osteen's brutal and gratuitous misuse of his football player's strength. In addition the issue of the proper sanction generally and here involves no subtleties of law or fact, being judgmental rather than rule-guided, like federal sentencing before the Sentencing Guidelines. Finally, the consequence for Osteen—a nonpermanent expulsion that did not prevent him from enrolling in another college—is not so grave as to entitle him to the procedural protections thought necessary in litigation because large interests of liberty or property may be at stake.

The last point gives us the most pause, as we suspect, though the record is barren on the point, that the expulsion cost Osteen scholarship assistance that he or his family needed. But when we consider all the factors bearing on his claim to a right of counsel, we conclude that the Constitution does not confer such a right on him. We doubt that it does in any student disciplinary proceeding. After *Walters v. National Association of Radiation Survivors*, 473 U.S. 305, 330–32, 105 S.Ct. 3180, 3194–95, 87 L.Ed.2d 220 (1985), the scope of the due process right to counsel seems excruciatingly narrow. *Gabrilowitz v. Newman* may survive, because "right to counsel" is rather a misnomer for the far more limited, and hence less costly and disruptive, right of consultation recognized there and not at issue in *Baxter v. Palmigiano*, where the prisoners were seeking the full right of counsel. But Osteen was not denied the right to *consult* counsel; and he had no greater right.

We do not condone trickery and coercion, alleged by Osteen but abandoned in this court. And we are sensible of the anomaly of having one's own assistant (Bolles's) sitting in judgment on one's case (Bolles was the "presenter"—in effect the prosecutor), although this kind of conflict of interest has not been thought in the previous cases involving school disciplinary action to violate due process. *Newsome v. Batavia Local School Dist., supra*, 842 F.2d at 926–27; *Gorman v. University of Rhode Island, supra*, 837 F.2d at 15. We need not decide today at what point informality of disciplinary procedures crosses the line drawn by due process, always assuming that a college or university student has the sort of "property" interest that the due process clause protects, an open question in this circuit as we said earlier. It is enough for the decision of this case that none of Osteen's nonwaived complaints about the procedure to which he was subject, signally including the limitations on the participation of counsel, crosses it.

AFFIRMED.