# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-3717

DIANE PUGEL,

Plaintiff-Appellant,

v.

BOARD OF TRUSTEES OF THE UNIVERSITY
OF ILLINOIS, a public corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 C 2036—**Michael P. McCuskey**, *Judge.*

_____

ARGUED MARCH 30, 2004—DECIDED AUGUST 6, 2004

_____

Before POSNER, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* After dismissal for academic miscon-
duct from the University of Illinois ("the University"), Diane
Pugel brought this 42 U.S.C. § 1983 action against the Board
of Trustees of the University ("the Board"). She alleged vio-
lations of her due process and free speech rights. Ms. Pugel
also brought state claims. The district court dismissed the
federal claims and declined to exercise supplemental juris-

diction over the state claims. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

Given the procedural posture in which this case comes to us, we must accept the allegations of Ms. Pugel's complaint as factually true and must rely solely upon those allegations. Prior to her dismissal, Ms. Pugel was enrolled as a graduate student in the physics department at the University of Illinois at Urbana-Champaign. She also served as a teaching assistant and received a stipend from the University for her services. In October 2000, Ms. Pugel submitted her research to the scientific journal *Nature*.[1] On March 15, 2001, she presented that research at a conference of the American Physical Society ("the APS").

On April 27, 2001, the University initiated a disciplinary action against Ms. Pugel based on allegations of academic misconduct. The Research Standards Officer sent Ms. Pugel a letter indicating that the University was investigating whether Ms. Pugel had fabricated the results included in *Figure 2* of the submission to *Nature* and whether, at the APS conference, she had presented results that she knew to be invalid. Specifically, the letter alleged:

---

[1] Ms. Pugel's complaint alleged that the *Nature* submission occurred in October 2001, but the submission could not have occurred in 2001 given the dates referenced in other allegations. In her brief to this court, Ms. Pugel indicates that the research was submitted to *Nature* on October 27, 2000.

> 1) You continued to use a seriously flawed algorithm to analyze your experimental data even after you were informed that the negative probabilities included in the algorithms were nonsensical; 2) You presented the data in *Figure 2* at the March 2001 meeting of the American Physical Society, even though you knew that there were questions about the validity of the data; 3) You have not produced a satisfactory explanation of how the points in this graph in *Figure 2* of the *Nature* submission were generated, despite requests for the original data and a documented analysis; and 4) You were not able to demonstrate the generation of the points in *Figure 2* from experimental data to Professor Laura Greene when requested to do so in person.

R.1 at 3. In accordance with University policies and procedures, a three-member "Inquiry Team" was appointed to review the factual allegations and to determine whether sufficient evidence of academic misconduct existed to warrant a full investigation.

On or about August 1, 2001, the Inquiry Team issued a report that found sufficient credible evidence to proceed with a full investigation. The report recommended that such an investigation focus on events from September 2000 through April 2001. Specifically, the Inquiry Team recommended full investigation of the following charges:

> 1) that Ms. Pugel fabricated the data included in *Figure 2* of the submission to *Nature* on October 27, 2001 [sic]; and, 2) that Ms. Pugel presented data that she knew to be invalid at the APS Meeting on March 15, 2001.

R.1 at 3-4. University policy required the Vice Chancellor for Research to review the Inquiry Team's report and to define the subject matter of further investigation in a written

charge to a four-member "Investigation Panel." The Vice Chancellor therefore submitted the Inquiry Team's recommendations for investigation as the specific charges against Ms. Pugel. At this time, Ms. Pugel was notified by the Research Standards Officer that the University was proceeding with the next phase of the disciplinary process and that the Investigation Panel had been appointed.

The Investigation Panel conducted a review of the charges. On September 27, 2001, the panel held a hearing at which Ms. Pugel had an opportunity to present evidence. Ms. Pugel presented the testimony of her physician, who opined that Ms. Pugel could not have been guilty of academic misconduct because she suffered from attention deficit hyperactivity disorder ("ADHD"). One of the panel members left the meeting during the presentation of this evidence.

On December 14, 2001, the panel concluded its investigation and issued a report in which it determined that

> Ms. Pugel fabricated the results included in *Figure 2* of the submission to *Nature* on October 27, 2001 [sic], and that she presented results she knew to be invalid at the APS Meeting on March 15, 2001. In the view of the Panel, these actions constitute grave academic misconduct under the University of Illinois Policy and Procedures on Academic Integrity in Research and Publication.

R.1 at 4. On April 17, 2002, the Acting Research Standards Officer sent a certified letter to Ms. Pugel, informing her that the Chancellor concurred with the Investigation Panel's conclusion of academic misconduct and that she had determined that the appropriate sanction for the misconduct was dismissal from the University. Ms. Pugel appealed the Chancellor's decision to the President of the University on six different grounds. On May 30, 2002, the President re-

sponded by letter, denying relief with respect to five of those grounds. He ultimately concluded, however, "that the Senate Committee should review the Investigative Report and decide if the violation of academic integrity in this case warrants a sanctioned dismissal." R.1 at 5.

On September 3, 2002, the Executive Director and Associate Dean of Students informed the Dean of the Graduate College as well as Ms. Pugel and her counsel that the Senate Committee on Student Discipline had determined that dismissal was warranted. On the basis of that decision, Ms. Pugel was dismissed from the University effective *nunc pro tunc* August 23, 2002. Ms. Pugel then brought this action against the Board.

## B. District Court Proceedings

Ms. Pugel alleged that her dismissal violated her due process and free speech rights. The Board filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The magistrate judge issued a report recommending dismissal, and the district court adopted the magistrate judge's recommendation.

With respect to the due process claims, the district court concluded that the allegations of the complaint revealed that Ms. Pugel had received notice and a meaningful opportunity to clear her name. As to the free speech claims, the district court concluded that the University's interest in academic integrity outweighed any speech interests of Ms. Pugel. Having dismissed the federal constitutional claims, the district court declined to exercise supplemental jurisdiction over Ms. Pugel's state claims.

## II

## DISCUSSION

### A. Standard of Review

We review de novo the district court's decision to grant a motion to dismiss under Rule 12(b)(6). *See Gonzalez v. City of Chicago*, 239 F.3d 939, 940 (7th Cir. 2001). We accept all well-pleaded facts as true, and we draw all reasonable inferences in Ms. Pugel's favor. *See id.* The motion is properly granted when the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *See Martinez v. Hooper*, 148 F.3d 856, 858 (7th Cir. 1998).

### B. Due Process Claim

A procedural due process claim requires a two-fold analysis. First, we must determine whether the plaintiff was deprived of a protected interest; second, we must determine what process is due. *See Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *Forbes v. Trigg*, 976 F.2d 308, 315 (7th Cir. 1992)). We assume for purposes of this appeal that Ms. Pugel was deprived of a cognizable interest.[2] We therefore

---

[2]  It is undisputed that Ms. Pugel was discharged on the basis of academic misconduct both from her status as a student and from her employment as a teaching assistant. We assume that Ms. Pugel was deprived of a protected interest in these circumstances.

It is an open question in this circuit as to whether a college or university student has a property interest in enrollment that is protected by the Due Process Clause. *See, e.g., Osteen v. Henley*, 13 F.3d 221, 223 (7th Cir. 1993). Nor do we have occasion, absent any argument by counsel, to determine whether Ms. Pugel had a prop-
(continued...)

address only whether Ms. Pugel was denied adequate procedural protections in the disciplinary proceedings.

## 1. Due process requirements

The hallmarks of procedural due process are notice and an opportunity to be heard. *See Mullane v. Cent. Hanover Bank &*

---

[2] (...continued)
erty right in her contractual relationship with the University. *Cf. Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987) (holding that an employee handbook can create enforceable contractual rights under traditional contract formation requirements). Also, "[a] person does not have a protectable liberty or property interest in her reputation." *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) (citing *Paul v. Davis*, 424 U.S. 693, 701, 711-12 (1976)).

However, the Supreme Court also has indicated that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972) (internal quotation marks and citation omitted). Ms. Pugel was dismissed from her position as a student and teaching assistant on charges of academic dishonesty. Under *Roth*, therefore, we assume that Ms. Pugel had a protectable interest and was entitled to notice and an opportunity to be heard. *See Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82-85 (1978) (discussing, under *Roth*, the possible existence of a liberty interest in pursuing a medical education and ultimately assuming the existence of a liberty or property interest for the purpose of analyzing the petitioner's due process claim); *cf. Head v. Chicago Sch. Reform Bd. of Trs.*, 225 F.3d 794, 801 (7th Cir. 2000) (indicating that if a public employee can show both the public infliction of a stigma as well as a "tangible loss of other employment opportunities as a result of the public disclosure," then the employee can state a claim for deprivation of a liberty interest).

*Trust Co.*, 339 U.S. 306, 313 (1950). Due process is a flexible concept that " 'calls for such procedural protections as the particular situation demands.' " *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). To evaluate the adequacy of procedural protections in a particular situation, we consider " '[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.' " *Id.* at 931-32 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Ms. Pugel is an employee of the University, but her employment arises out of her status as a graduate student. As a general matter, the Supreme Court's case law on the adequacy of procedural protection has distinguished between employees and students. In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), upon which both parties rely, the Supreme Court considered the *Mathews* factors and determined that a pretermination hearing was necessary in the case of a tenured public employee. *See id.* at 542-46. The Court indicated that such an employee is "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546.

The Supreme Court has approved less rigid procedural requirements in the student context, however. In *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court indicated that a high school student facing a ten-day suspension for misconduct was entitled to "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. Courts addressing graduate student dismissals on charges of academic dishonesty

traditionally have relied upon *Goss. See Than v. Univ. of Texas Med. Sch. at Houston*, 188 F.3d 633, 635 n.2 (5th Cir. 1999); *Crook v. Baker*, 813 F.2d 88, 97 (6th Cir. 1987); *Nash v. Auburn Univ.*, 812 F.2d 655, 660-61 (11th Cir. 1987); *cf. Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 308-09 (6th Cir. 1984) (addressing the rescission of a previously awarded master's degree on a charge of academic dishonesty).

Nonetheless, the deprivation to which Ms. Pugel was subjected is more severe than the ten-day high-school suspensions at issue in *Goss. See Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 86 n.3 (1978) ("[T]he deprivation to which respondent was subjected—dismissal from a graduate medical school—was more severe than the 10-day suspension to which the high school students were subjected in *Goss*."). The severity of the deprivation suggests the appropriateness of "more formal procedures." *Goss*, 419 U.S. at 584. Indeed, more extensive procedures in the context of a university dismissal comport with the Supreme Court's own admonition in *Goss* that due process requirements depend upon context. *See id.* at 578; *see also id.* at 584.[3] Accord-

---

[3] We note that, in *Horowitz*, the Supreme Court indicated that although the deprivation at issue was more severe, a medical student's dismissal for *unsatisfactory academic performance* warranted "far less stringent procedural requirements" than dismissal for misconduct. *Horowitz*, 435 U.S. at 86. Given "all relevant factors, including the evaluative nature of the inquiry and the significant and historically supported interest of the school in preserving its present framework for academic evaluations," the Court concluded that a hearing was not required by the Fourteenth Amendment. *Id.* Rather, notice of unsatisfactory academic performance and a careful and deliberate dismissal decision met due process requirements. *See id.* at 85.

A charge of fabricated data and improper research presentation is not unrelated to the issue of a student's satisfactory academic
(continued...)

ingly, those cases considering the adequacy of notice and hearing procedures in the context of graduate student deprivations have dealt with procedural requirements significantly more extensive than those described in *Goss*.[4]

Even assuming, then, that Ms. Pugel was entitled to heightened levels of process, such as the requirements contemplated in *Loudermill*, she has not alleged a viable claim for a violation of due process. It is clear from the complaint

---

[3] (...continued)
progress. However, we assume for purposes of this opinion that Ms. Pugel's discharge on allegations of academic fraud constituted a disciplinary decision. *Cf.* Fernand N. Dutile, Disciplinary Versus Academic Sanctions in Higher Education: A Doomed Dichotomy?, 29 *J.C. & U.L.* 619 (2003).

[4] *See, e.g.*, *Than v. Univ. of Texas Med. Sch. at Houston*, 188 F.3d 633, 634-35 (5th Cir. 1999) (concluding that student was not deprived of due process when process that student received included "ample notice of the charges and the evidence," a hearing before an impartial and knowledgeable hearing officer and representation at that hearing by counsel, who was able to call nine witnesses, to introduce more than sixty exhibits, to cross-examine adverse witnesses and to make an opening and closing statement); *Crook v. Baker*, 813 F.2d 88, 98-99 (6th Cir. 1987) (determining, among other issues, that student was not deprived of due process when his counsel was unable to examine and cross-examine witnesses at the disciplinary hearing); *Nash v. Auburn Univ.*, 812 F.2d 655, 660-67 (11th Cir. 1987) (concluding that students were not denied due process in timing and content of formal notice, inability to cross-examine witnesses, denial of recess, and various other circumstances that students described as prejudicial or inadequate); *cf. Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 308-09 (6th Cir. 1984) (concluding that right to counsel at disciplinary hearing was not a "clearly established" right but noting that "[w]e do not, however, speak to the issue of whether such a right *should* exist in this kind of disciplinary proceeding").

that Ms. Pugel received written notice of the charges against her and a pretermination hearing in which she had an opportunity to explain her side of the story. Ms. Pugel alleged, however, that certain deficiencies in the notice and hearing she received constitute due process violations. We disagree.

### 2. Procedures afforded Ms. Pugel

We review first the process Ms. Pugel received. As alleged in the complaint, in April of 2001, Ms. Pugel received notice of an academic inquiry into her conduct in generating and presenting her data.[5] That inquiry led to a full-scale in-

---

[5]  Ms. Pugel may have had notice of faculty concern with her methodology even prior to this time. One of Ms. Pugel's own allegations suggests that, before the March 2001 APS meeting and prior to the allegations of misconduct, she had been warned as to the invalidity of her data:

> 11. Specifically, the research standards officer in a letter dated April 27, 2001 set forth the specific allegations for the Inquiry Team to consider:
>
>> 1) You continued to use a seriously flawed algorithm to analyze your experimental data even after you were informed that the negative probabilities included in the algorithms were nonsensical; 2) You presented the data in *Figure 2* at the March 2001 meeting of the American Physical Society, even though you knew that there were questions about the validity of the data . . . .

R.1 at 3. Ms. Pugel did not allege any facts contrary to the letter's accusations.

It might be reasonable therefore to infer that she was in fact questioned as to the validity of the data prior to its presentation
(continued...)

vestigation, the existence of which Ms. Pugel was notified in the fall of 2001. At this time, she also was notified of the formal charges against her: the submission of fraudulent data to *Nature* and the presentation of data she knew to be invalid at the APS conference. In September 2001, a hearing was held before the Investigation Panel, at which time Ms. Pugel had an opportunity to present witnesses and to introduce evidence on her behalf. The December decision of the Investigation Panel, that Ms. Pugel had engaged in academic misconduct, was subject to review by the Chancellor. In April of 2002, Ms. Pugel received notice that the Chancellor concurred with the Investigation Panel and had determined that dismissal was appropriate. Ms. Pugel then had an opportunity to appeal that decision to the President. The President affirmed the Chancellor's decisions on five of six grounds asserted by Ms. Pugel but did, in fact, reverse the Chancellor's discharge decision on the ground that another decisionmaking body should review the sanction. In September of 2002, Ms. Pugel was informed that the Senate Committee on Student Discipline had determined that dismissal was warranted and that her discharge had become effective as of August 23, 2002.

We turn next to Ms. Pugel's specific allegations of inadequate process. As part of her due process claim, Ms. Pugel alleged that the University failed to inform her of the charges and that the decision to discharge her was based on an alle-

---

[5] (...continued)
at the APS conference. *Cf. Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) ("[T]he court is not required to ignore facts alleged in the complaint that undermine the plaintiff's claim."). Nonetheless, in cautious deference to the standard of review, we do not rely upon any warnings Ms. Pugel may have received prior to April of 2001.

gation abandoned before the formal charges. These claims contradict her prior factual allegations. According to her own complaint, Ms. Pugel received written notice of an inquiry into her research. She later received written notice of formal charges that she fabricated data submitted to *Nature* and that she presented data she knew to be invalid at the APS meeting. The Investigation Panel found Ms. Pugel guilty of those charges. The Senate Committee concluded that dismissal was warranted based on those conclusions. Thus, Ms. Pugel's own complaint reveals that she had notice of the charges against her and that the decision to discharge her was based on those same charges. This court is not obligated by the standard of review to disregard factual allegations that undermine a plaintiff's claim. *See, e.g.*, *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1416 (7th Cir. 1992); *see also Endsley v. City of Chicago*, 230 F.3d 276, 284 (7th Cir. 2000) (indicating that a plaintiff may plead herself out of court by including factual allegations, which, if true, reveal that legal rights were not invaded).

Ms. Pugel further alleged that she lacked a meaningful opportunity for a hearing. She submits that the Investigation Panel reached a conclusion contrary to the testimony of her physician and that one of the Investigation Panel members did not hear a portion of that testimony. We conclude that these alleged insufficiencies do not rise to the level of a constitutional deprivation.

First, according to the complaint, Ms. Pugel's physician testified that she could not be guilty of academic misconduct because she suffered from ADHD. Due process did not entitle Ms. Pugel to a favorable result based on this testi-

mony, only to a meaningful opportunity to present it.[6] It is clear from the complaint that, in presenting her physician's testimony, Ms. Pugel had an opportunity to explain why she should not be found guilty of academic misconduct. Due process does not require decisionmakers to adopt the charged party's explanation.

Second, the absence of one panel member from a portion of the physician's testimony did not invalidate the meaningfulness of the hearing. Three other members of the Investigation Panel were present, and the panel's decision was subject to further review by the Chancellor, President and Senate Committee. Although the panel member's absence may have violated Ms. Pugel's rights under the University's policies, a violation of state law is not necessarily a violation of due process. *See Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) ("[A] violation of state law (for purposes of this case the student judicial code may be treated as a state law) is not a denial of due process, even if the state law confers a procedural right.").

Ms. Pugel's allegations reveal that she received an opportunity to present witnesses on her behalf to the Investigation Panel. After the hearing and determination of misconduct, she was able to appeal the Chancellor's decision to dis-

---

[6] *See, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."); *cf. Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1010-11 (7th Cir. 2002) (noting in the context of a high school expulsion that due process requires a meaningful opportunity to be heard); *Linwood v. Bd. of Educ.*, 463 F.2d 763, 770 (7th Cir. 1972) (indicating in the case of a high school expulsion that a "hearing must be at a meaningful time and in a meaningful manner").

charge her to the University's President. She then received a further review of the sanction by the Senate Committee on Student Discipline. The complaint does not allege that these procedures were a sham. *Cf. Levenstein v. Salafsky*, 164 F.3d 345, 351-52 (7th Cir. 1998) (holding that constructively discharged medical school professor who essentially alleged that procedures were "a sham through and through" sufficiently alleged a due process violation). Nor do the specific allegations of error rise to the level of a due process violation. Thus, the complaint itself establishes that Ms. Pugel received substantial opportunity for hearing that comports with due process.

In sum, according to Ms. Pugel's own complaint, five decisionmaking entities found evidence that she had fabricated data and then publicly had presented that data knowing it to be invalid. The ultimate decisionmakers determined that the misconduct warranted dismissal. Throughout the seventeen-month disciplinary process, Ms. Pugel received notice of the charges against her and of the decisionmakers' determinations. She had an opportunity both to present evidence on her behalf and to appeal the discharge decision. Accepting these factual allegations as true, we conclude that Ms. Pugel's claims of inadequate process either contradict her factual allegations or do not rise to the level of constitutional concern. Ms. Pugel therefore has failed to state a claim for violation of due process.

## C. Free Speech Claim

We pause at the threshold of our analysis of the free speech claim to note specifically the procedural posture and the context of this particular case. First, in analyzing Ms. Pugel's First Amendment claim, the parties and the district court focused on Ms. Pugel's status as a teaching assistant.

As a teaching assistant employed by the University, Ms. Pugel was a public employee as well as a graduate student.[7] In prior cases involving free speech claims in the context of public employment, we have proceeded cautiously in reviewing dismissals on the basis of the pleadings.[8] Indeed, we have stated that " 'it would be a rare case indeed where the pleadings as a whole would permit judgment as a matter of law' in favor of the employer." *Trejo v. Shoben*, 319 F.3d 878, 885 (7th Cir. 2003) (quoting *Gustafson v. Jones*, 117 F.3d 1015,

---

[7] Because we adopt the parties' reliance on Ms. Pugel's status as a public employee and analyze her claims under that status, we have no occasion to express an opinion about the appropriate framework for analysis of graduate student speech. *Compare Brown v. Li*, 308 F.3d 939, 947-54 (9th Cir. 2002) (Graber, J.) (applying *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), to graduate student's curricular speech), *with id.* at 956, 960-63 (Reinhardt, J., concurring in part and dissenting in part) (rejecting application of *Hazelwood* to college and graduate student speech). *See generally* Tom Saunders, Case Comment, The Limits on University Control of Graduate Student Speech, 112 *Yale L.J.* 1295 (2003) (advocating framework resembling public employment analysis in the context of graduate student speech).

[8] *See Trejo v. Shoben*, 319 F.3d 878, 885-86 (7th Cir. 2003) (determining that allegations that professor was discharged on the basis of speech that certain graduate students had found "too provocative, insensitive, and/or 'politically incorrect' " stated a claim for violation of free speech rights but ultimately affirming the district court's dismissal of the First Amendment claim on the ground that discovery with respect to another claim had revealed that the University would have been entitled to summary judgment); *Eberhardt v. O'Malley*, 17 F.3d 1023, 1025-28 (7th Cir. 1994) (determining that allegations that attorney was discharged for writing a novel stated a claim for violation of free speech rights and reversing the district court's decision to dismiss the First Amendment claim under Federal Rule 12(b)(6)).

1019 (7th Cir. 1997)). Thus, we recognize, as did the district court, that the procedural posture of this case necessitates cautious review. However, we also recognize that, despite this cautionary approach, a plaintiff nevertheless can plead herself out of court "by including factual allegations which, if true, show that [her] legal rights were not invaded." *Endsley*, 230 F.3d at 284; *see also Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994) (concluding that due process claim was dismissed properly because "the detail of the complaint does defeat the pleader"). Acknowledging both principles, we now proceed in our analysis of Ms. Pugel's free speech claim.

In the context of a non-tenured professor's First Amendment rights, this court has affirmed the right of members of a university community to "engage in academic debates, pursuits, and inquiries," while noting nevertheless that a public employee's right to free speech is not absolute. *Trejo*, 319 F.3d at 884. We therefore evaluate Ms. Pugel's speech under the well-established *Connick-Pickering* framework of analysis. *See id.; see also Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

In *Trejo*, this court commented: "[W]here the employer brings a motion to dismiss the employee's free speech claim *on the basis of the pleadings rather than on the facts in the record*, the speech may be presumed to involve a matter of 'public concern' if it touches upon 'any matter for which there is potentially a public' interest." *Trejo*, 319 F.3d at 885 (quoting *Eberhardt*, 17 F.3d at 1026). We thus assumed that an allegation of " 'academic and intellectual debate' " on matters of human sexuality alleged a matter of public concern. *Id.* Similarly, Ms. Pugel's complaint alleged the "presentation of scientific research . . . by her as an interested citizen to a group of scientists." R.1 at 5. We therefore assume that Ms.

Pugel sufficiently has alleged speech that "warrant[s] some level of constitutional protection." *Trejo*, 319 F.3d at 885.[9]

We conclude, however, under *Pickering*, that the University's interest as an employer outweighed Ms. Pugel's interest in speaking. *See Pickering*, 391 U.S. at 568. As we have discussed, the University determined through its internal disciplinary process that Ms. Pugel knowingly presented invalid data at the APS conference. A scientific presentation is connected directly with the University's mission of intellectual enrichment and research. Moreover, the public presentation of false data by a graduate-level student affiliated with the University has significant ramifications on the discipline and rigor of the University's intellectual enterprise and, as a result, on the University's reputation in the broader academic and scientific community. These factors weigh heavily in favor of the University's right to make employment (and enrollment) decisions based on Ms. Pugel's APS presentation.[10] *Cf. Feldman v. Ho*, 171 F.3d 494, 497-98 (7th Cir. 1999)

---

[9]  "[F]alse and recklessly made" speech may not be entitled to First Amendment protection even if it purports to touch upon matters of public interest. *McGreal v. Ostrov*, 368 F.3d 657, 673 (7th Cir. 2004); *see also Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."). Ms. Pugel's complaint does not plead as to the truth or falsity of the University's charge that she knowingly presented invalid data, however, and it would be inappropriate under the standard of review to assume that her speech was, in fact, "false and recklessly made." We therefore draw the opposite inference and assume instead that the speech involved a matter of public concern under *Connick*.

[10] The force of this principle is not undermined by the allegation that Ms. Pugel appeared at the APS conference voluntarily, absent a degree requirement. Nor is it undermined by the allegation that
(continued...)

(noting that university's faculty employment decisions were "both inevitably concerned with speech and so central to a university's mission that the university's role as employer dominates"). Thus, we hold that the University's interest in protecting its academic integrity clearly outweighs any interest Ms. Pugel had in presenting what the University determined to be fraudulent data.

The right of free speech protects the marketplace of ideas, which is "broadly understood as the public expression of ideas, narratives, concepts, imagery, opinions—scientific, political, or aesthetic—to an audience whom the speaker seeks to inform, edify, or entertain." *Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir. 1990). Yet, despite the breadth of protection afforded the marketplace of ideas, the First Amendment does not protect Ms. Pugel from the academic and employment consequences that ensued from her research presentation when the University determined, through constitutionally adequate disciplinary proceedings, that the presentation was fraudulent.

## D.  Supplemental Jurisdiction

Given our conclusion that the district court properly dismissed the due process and free speech claims, Ms. Pugel's argument that the court improperly declined to exercise supplemental jurisdiction over her state claims similarly fails. *See, e.g.*, *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244,

---

[10] (...continued)
University policies required her to respond to questions. By Ms. Pugel's own allegation, the University required "*proper* academic response." R.1 at 5 (emphasis added). The University was entitled to deem Ms. Pugel's response improper to the extent it determined that she presented fraudulent data.

1251 (7th Cir. 1994) ("[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolv[e] them on the merits." (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966))). We note further that Ms. Pugel raised this issue only in her reply brief. "Arguments raised for the first time in a reply brief are waived." *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998).

## Conclusion

We conclude that the district court properly dismissed Ms. Pugel's due process and free speech claims on the basis of the complaint and properly declined to exercise supplemental jurisdiction over her state claims. Ms. Pugel's allegations themselves, accepted as true, reveal that her constitutional rights were not invaded. Accordingly, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*