# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3228

MARTHA LOUISE PIGGEE,

*Plaintiff-Appellant,*

*v.*

CARL SANDBURG COLLEGE, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 03-1329—**Joe Billy McDade**, *Judge.*

ARGUED FEBRUARY 9, 2006—DECIDED SEPTEMBER 19, 2006

Before BAUER, EASTERBROOK, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* In September 2002, Martha Louise Piggee, who was then a part-time instructor of cosmetology at Carl Sandburg College, gave a gay student two religious pamphlets on the sinfulness of homosexuality. The student was offended and complained to college officials. After the college looked into the matter, it found that Piggee had sexually harassed the student. It admonished her in a letter to cease such behavior, and the following semester it chose not to retain her. Piggee sued the college, the members of its board of trustees, and various college administrators (including one person who directed the mortuary science program, whose offense was to clean out Piggee's refrigera-

tor and throw away her noodles at some point during the spring of 2003) under 42 U.S.C. § 1983. She asserted, among other things, that the measures the college took violated her due process rights, her rights under the Free Exercise, Equal Protection, and Free Speech clauses of the Constitution, and that the college's sexual harassment policy was constitutionally infirm. Noting that none of the facts was seriously in dispute, the district court entered summary judgment for the defendants. We affirm.

**I**

Carl Sandburg College ("the college") is a public community college located in downtown Galesburg, Illinois. Its cosmetology department requires its students to undertake a combination of classroom and clinical work in a facility that operates as an ordinary beauty salon open to the public. Jason Ruel was a student in the program. He enrolled in June 2002, and Piggee was his instructor for several classes. At some point, Ruel became aware that Piggee was a Christian and she realized that he was gay. On September 5, 2002, Piggee placed two pamphlets in Ruel's smock during clinical instruction time, as he was preparing to leave for the day. She told him to read the materials later and invited him to discuss them with her.

The next day, Ruel glanced at the pamphlets, both of which used a comic-book format. The first was entitled "Sin City." It tells the story of a man who tries to persuade gay pride advocates that homosexuality is an abomination. He is beaten when he tries to stop a gay pride parade; he is arrested by the police; a demon urges on a minister who preaches that God loves even gay people; the man then asks about Sodom and Gomorrah; and eventually the minister repents his sin (which apparently is supporting gay pride). The second pamphlet was entitled "Doom Town." Its message is similar. It begins by showing a group of homo-

sexuals headed by a speaker, who states that a certain number of children will wind up homosexual. She threatens that all gay males will pollute the blood supply with HIV-positive blood unless people give more money for AIDS research. A Christian observing this recounts the story of Sodom and Gomorrah. One scene implies that an evil man is about to assault a frightened boy sexually; another indicates that some angels being sheltered by Lot are about to be raped. God, however, intervenes, stops the mob, and destroys the two sinful cities.

A short time later, on September 17, Ruel wrote to Barb Kirchgessner, the director of the cosmetology program, Tim Smith, chair of the college's business division, and Larry Benne, the vice president of instructional services, telling them about Piggee's pamphlets and stating that he "was appalled at what [he] found inside [them]." As the district court put it, "[h]e did not appreciate being called an abomination, a child molester, or a rapist and a deviant." Ruel urged the administrators to terminate Piggee's employment.

In a follow-up letter written on September 19, Ruel reported that Piggee had approached him and accused him of trying to get her fired. Initially, he said that he did not know what she was talking about, but after she demanded that he follow her into a back room (where she shut the door), he conceded that he had complained, and told her that the matter was being handled through the proper channels. Uncomfortable with the whole conversation, Ruel soon walked out.

Other college administrators, including Mike Walters, the affirmative action officer, and Cheryl Cummings, the equal employment opportunity officer, and Lori Sundberg, the dean of human resources, promptly began investigating Ruel's complaint. They visited Piggee at home, where she essentially confirmed the account Ruel had given of the

incident. On September 24, Benne wrote to Piggee and another teacher, Linda Delawder, who had supported Piggee, formally telling them that there had been a formal complaint by a student claiming a hostile environment and reminding them that students had a right to their beliefs. The letter went on to say that "[t]he purpose of our program is to provide instruction for Cosmetologist [sic] not religious, social and sexual beliefs or provide written materials to influence those beliefs." It called on them to cease such activities immediately, and warned them that further actions "could lead to disciplinary measures up to and including discharge."

On October 7, Walters and Cummings wrote a memo to Benne and Piggee, which read as follows:

> It is the finding of the Affirmative Action Officer and the Equal Employment Opportunity Officer that sexual harassment has taken place in the case of Jason Ruel. It has been found that because of Mr. Ruel's sexual orientation, Mrs. Louise Piggee has been proselytizing in the hopes of changing Mr. Ruel's sexual orientation and religious beliefs.

> Recommendation: The recommendation is that Mrs. Piggee be given a warning to cease and desist all proselytizing in the workplace to Mr. Ruel and/or to other students. Failure to cease and desist will constitute insubordination, which can result in disciplinary action up to, and including, termination.

In a later letter to Piggee, Benne indicated that he agreed with this recommendation.

When the time came for the college to decide whether to offer Piggee a contract for the spring of 2003, Benne advised Smith that this would be unwise. Smith passed this advice along to Kirchgessner, who decided to accept it. On January 6, 2003, Piggee received a letter from Kirchgessner inform-

ing her that she was not needed for the spring 2003 semester. On October 9, 2003, Piggee filed this lawsuit; the district court denied her motion for summary judgment and granted the defendants' motion for summary judgment on June 27, 2005.

## II

Although Piggee's brief purports to raise 10 issues on appeal, we see four broad arguments that we need to address: (1) whether her speech was on a matter of public concern; (2) whether the college's interest in enforcing its sexual harassment policy or controlling the cosmetology program outweighed Piggee's free speech interest; (3) whether the college unlawfully imposed a prior restraint on her speech; and (4) whether any such prior restraint was overbroad or unconstitutionally vague. Piggee also raises due process and equal protection claims, and the college asserts that its administrators are entitled to qualified immunity, should this court decide that Piggee has alleged a constitutional violation.

Before turning to these specific arguments, we think it important to set the stage. Apart from her due process and equal protection arguments, Piggee's real complaint has to do with her ability to speak at the workplace, and in particular her ability to discuss matters of religious concern there. Since the oral argument in this case, the Supreme Court has spoken to these issues, in *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006). We therefore begin with a look at *Ceballos*, and then turn to Piggee's arguments.

*Ceballos* involved a claim brought by a deputy district attorney, Richard Ceballos, who worked for the Los Angeles County District Attorney's office. When a defense attorney told Ceballos that he had found inaccuracies in an affidavit supporting a search warrant, Ceballos looked into the matter and concluded that defense counsel was right. He

communicated his concerns to his supervisors and wrote a couple of memoranda about the problem. The supervisors heard him out, but they decided in the end to continue with the prosecution. As a result of this disagreement, Ceballos claimed, he was subjected to a series of retaliatory actions, including a reassignment, a transfer to another location, and the denial of a promotion. He sued under 42 U.S.C. § 1983. The district court ruled for the county defendants, but the Ninth Circuit reversed, holding that "Ceballos's allegations of wrongdoing in the memorandum constitute protected speech under the First Amendment." 126 S.Ct. at 1956, quoting from 361 F.3d 1168, 1173 (9th Cir. 2004). The Supreme Court accepted the case and reversed.

The Court's opinion reviews the line of cases dealing with employee speech that began with *Pickering v. Board of Educ. of Township High School Dist. 205*, 391 U.S. 563 (1968). It summarized those cases in the following way:

> The Court's decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions. . . . Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Connick [v. Meyers]*, 461 U.S. [138,] at 154 [(1983)].

126 S.Ct. at 1959. Applying those principles to the facts before it, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960.

Application of these principles to the educational setting requires an appreciation of the way in which teachers,

professors, or instructors communicate with their students. As we have recognized in the past, academic freedom has two aspects. We wrote in *Trejo v. Shoben*, 319 F.3d 878 (7th Cir. 2003) that "the First Amendment protects the right of faculty members to engage in academic debates, pursuits, and inquiries" and to discuss ideas. *Id.* at 884. The idea of some kind of government-sponsored orthodoxy in the classroom is repugnant to our values. On the other hand, we have also recognized that a university's "ability to set a curriculum is as much an element of academic freedom as any scholar's right to express a point of view." *Webb v. Bd. of Trustees of Ball State Univ.*, 167 F.3d 1146, 1149 (7th Cir. 1999). We added, in *Webb*, that "[u]niversities are entitled to insist that members of the faculty (and their administrative aides) devote their energies to promoting goals such as research and teaching." *Id.* at 1150. No college or university is required to allow a chemistry professor to devote extensive classroom time to the teaching of James Joyce's demanding novel *Ulysses,* nor must it permit a professor of mathematics to fill her class hours with instruction on the law of torts. Classroom or instructional speech, in short, is inevitably speech that is part of the instructor's official duties, even though at the same time the instructor's freedom to express her views on the as-signed course is protected.

The examples we have just given illustrate why it is not very useful to focus on the fact that speech about religion, or speech about the pros and cons of homosexual behavior, plainly deals with a topic that richly deserves full public discussion. So, for that matter, does tort law, or *Ulysses* (which, recall, was initially banned in this country as obscene, see *United States v. One Book Entitled* Ulysses *by James Joyce*, 72 F.2d 705 (2d Cir. 1934)). (The way to fit this conclusion into traditional *Pickering* analysis is to say that we assume, for purposes of this discussion, that Piggee's proselytizing is speech that qualifies as a

matter of public concern; it certainly had nothing to do with how to style hair.) The real question, however, is whether the college had the right to insist that Piggee refrain from engaging in that particular speech while serving as an instructor of cosmetology.

Piggee's first effort to convince us that the college had no such right is to argue that the clinical beauty salon where she approached Ruel was just a store, like any other store. Had she come up to Ruel in a local grocery store and slipped the pamphlets into his pocket, we would have a different case. It is still possible that this might have raised concerns, because the instructor/student relationship does not end the moment the instructional period is over. Compare *Doe v. Oberweis Dairy*, 456 F.3d 704, 715-16 (7th Cir. 2006) (for purposes of Title VII sexual harassment claim, sex act with supervisor need not have been committed in the workplace in order to have consequences there). If we conclude that the beauty salon where Ruel was working was part of the instructional environment, however, we need not reach the question of Piggee's responsibilities away from the college.

We have little trouble concluding that the beauty salon was, in fact, one of the places where cosmetology instruction was taking place. It is undisputed that students enrolled in this program must participate in two different kinds of instruction: classroom, and hands-on clinical work. This type of program is exceedingly common, especially for those learning some type of service. Law students almost universally have the opportunity to work in instructional clinics, which typically are open to the public and offer legal services to indigent clients; medical students begin supervised work with real patients in university-affiliated hospitals and clinics while they are still in medical school, even before they complete their formal education with a residency. The beauty clinic operated by Carl Sandburg College served exactly the same function: students were

able to learn their trade by serving customers under the supervision of trained instructors like Piggee. Whether the customers themselves were chatting about religion, or the latest Chicago Cubs game, or the price of gasoline, the college was entitled to insist on a professional relationship between the students and the instructors.

The Supreme Court's decision in *Ceballos* is not directly relevant to our problem, but it does signal the Court's concern that courts give appropriate weight to the public employer's interests. In that case, the employer had an interest in the deputy district attorney's recommendations about prosecutions, in the face of a problematic search warrant affidavit. Here, the public employer is a university, and its interest is in the instructor's adherence to the subject matter of the course she has been hired to teach. We recognized, in *Pugel v. Bd. of Trustees of Univ. of Illinois,* 378 F.3d 659 (7th Cir. 2004), that a university's right to monitor the data presented by graduate students, and its right to take measures against false data, "has significant ramifications on the discipline and rigor of the University's intellectual enterprise and, as a result, on the University's reputation in the broader academic and scientific community." *Id.* at 668. That interest outweighed any right the graduate student had to present the questionable data. Here, the college had an interest in ensuring that its instructors stay on message while they were supervising the beauty clinic, just as it had an interest in ensuring that the instructors do the same while in the classroom.

Piggee's "speech," both verbal and through the pamphlets she put in Ruel's pocket, was not related to her job of instructing students in cosmetology. Indeed, if it did anything, it inhibited her ability to perform that job by undermining her relationship with Ruel and other students who disagreed with or were offended by her expressions of her beliefs. The record reflects that her actions disrupted Ruel's education: he testified that he "avoided her like the

plague," that he was unhappy that he still had to go to a class that she taught, and that he felt unsafe because she was present. Furthermore, while Ruel was the only student who complained formally, Piggee herself testified that she gave various religious pamphlets to other students as part of her effort to "witness." Out of eight student evaluations of Piggee's performance from the fall semester of 2001, five spoke about Piggee's emphasis on religion. One student wrote "Mrs. Piggee usually inquires [sic] her religion into everyday. Some people don't always agree w/ what she feel. I think that if we are taught that we are not to speak of our religions in the salon, neither should she." Another commented "Mrs. Piggee is a great teacher, but I really do not appreciate religion being discussed in school. I do not believe the same way she does and don't want to hear how my religion is inferior to hers." A third said "Mrs. Piggee . . . told me that I was not saved & that I have the devil in me. She also told me that she was going to get that devil out of me. . . . I just wish that she will [sic] keep her religion out of school." This evidence shows, at a minimum, that the college reasonably took the position that nongermane discussions of religion and other matters had no place in the classroom, because they could impede the school's educational mission.

What we have said thus far disposes of Piggee's first two points on appeal. We now comment briefly on the latter two: that the college was imposing an unlawful prior restraint on her speech and that its restraint was overbroad or vague. The district court did not reach the merits of the prior restraint argument. It thought that Piggee lacked standing to ask for an injunction against the college's actions, because by the time she filed her complaint in October 2003 she had already been off the college's payroll for a year. Insofar as she was seeking prospective equitable relief, we agree with the district court that the possibility of any future injury was indeed too remote. See *City of Los Angeles*

*v. Lyons,* 461 U.S. 95, 105 (1983). Piggee responds only that she remains on the substitute teacher list, and thus that she could be called up any time. But she has not been invited to teach at Carl Sandburg College since December 2002. We conclude that she cannot show that she "is immediately in danger of sustaining some direct injury as a result of the challenged official conduct and the injury or threat of injury . . . is both real and immediate, not conjectural or hypothetical." *Id.* at 102; see also *Sierakowski v. Ryan,* 223 F.3d 440, 444 (7th Cir. 2000) (finding that plaintiff, whom doctors had tested for HIV, could not demonstrate that he was likely to be tested without consent in the future and therefore had no standing to request an injunction).

It appears, however, that Piggee is also seeking compensatory damages from the individual college officials, acting in their individual capacities, for the period of time between September and December 2002. This argument implicates the defendants' qualified immunity argument. See *Saucier v. Katz,* 533 U.S. 194 (2001). If, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right," *id.* at 201, the court must decide "whether the right was clearly established." *Id*. The latter inquiry, the Court emphasized, "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*.

In *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995), the Supreme Court held that when the government imposes a prior restraint on employee speech, it has a greater burden to justify its action than when it makes an isolated employment decision. In order to support a prior restraint, it must demonstrate that the interests of both potential audiences and all employees (present and future) in expression are outweighed by the restrained expression's "'necessary impact on the actual operation' of the Government." *Id*. at 468 (quoting *Pickering*, 391 U.S. at

571); see also *Crue v. Aiken*, 370 F.3d 668, 678-80 (7th Cir. 2004) (applying test). In Piggee's case, however, it is not clear what action of the college is the prior restraint to which she objects. In her appellate brief, Piggee appears to rest on the October 16, 2002, letter she received, which directed her not to "comment or take action relative to one's sexual orientation or religion." That letter purports to rely on the college's sexual harassment policy, but we do not understand Piggee to be claiming that the policy itself is an unlawful prior restraint.

For many of the reasons we explained earlier, we see no reason why a college or university cannot direct its instructors to keep personal discussions about sexual orientation or religion out of a cosmetology class or clinic. Only in the most literal sense is this a "prior restraint." We doubt strongly that Piggee is waging an attack on all rules that permit educational institutions to set curricula and to establish relevant boundaries. Nor is Piggee arguing that colleges have no right to prohibit speech that amounts to sexual, racial, or other harassment, and if she were, we would reject that position. Even though the sexual harassment policy may not have been a perfect fit for the behavior at issue here, the responsible college officials were not unreasonable when they told Piggee that her actions had a harassing effect on Ruel and that this fell within the ambit of their anti-harassment policy. Under the facts before us here, we conclude that the college's policy was not an unconstitutional prior restraint. The doctrines of vagueness and overbreadth do not apply here, as no one was threatening to proceed criminally against Piggee.

## III

Finally, we see no merit in Piggee's due process or equal protection arguments. She complains that she did not have advance notice of the college's policies prohibiting her

proselytizing, but she is looking at matters the wrong way. The initial letters she received did provide her with notice. Absolutely nothing happened to her when those letters were sent: her salary was unchanged, her employment status was unchanged, and nothing else adverse took place. Her argument seems to contemplate an infinite regression of notices, where any notice sent must have been preceded by another notice that the second notice might come along. The due process clause requires no such thing. Nor has she stated an equal protection claim. She has not pointed to any similarly situated non-Christian employee who was permitted to discuss religion or homosexuality in the clinic, nor has she suggested that only she, and not others, was held accountable under the sexual harassment policy. To the contrary, Linda Delawder received the same letter that Piggee did.

We AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*